UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALAN DREYFUS,<br>　　　　　Plaintiff,<br><br>　　v.<br><br>JAMES ROMANO, TOWN OF<br>BERKLEY and BOARD OF HEALTH,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)　　DOCKET NO.: 05 10876 WGY<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, the Defendants, James Romano, Town of Berkley and Board of Health, submit the following statement of undisputed facts in support of their accompanying motion for summary judgment as to the claims of the Plaintiff, Alan Dreyfus.

### Statement of Undisputed Facts

1.　　The Plaintiff, Alan Dreyfus, is an individual who owns real property located at 46R North Main Street in Berkley, Massachusetts.  (Complaint, **Exhibit A**, ¶ 1).

2.　　The Defendant, James Romano, is an individual who, at all times relevant to the Plaintiff's complaint, was a member of the Board of Health for the Town of Berkley. (Complaint, **Exhibit A**, ¶ 15).

3.　　The Defendant, Town of Berkley, is a municipality in the Commonwealth of Massachusetts.  (Complaint, **Exhibit A**, ¶ 3).

4.　　The Defendant, Board of Health, is a board of elected members within the Town of Berkley charged with the responsibility of administering health regulations for the purpose of

preserving and protecting the health of citizens within the Town of Berkley. (Complaint, **Exhibit A**, ¶ 4; Affidavit of James Romano, **Exhibit B**, ¶ 3).

5.      The Plaintiff purchased the property located at 46R North Main Street in Berkley (hereinafter referred to as the "Dreyfus property") on April 18, 2003. (Deposition of Alan Dreyfus, January 11, 2006, **Exhibit C**, pp. 18, 25).

6.      The Dreyfus property comprises an 8.76 acre parcel, consisting of two separate lots: one 1.58 acre lot in the front and one 7.18 acre lot in the rear. At the time of the plaintiff's purchase, the property was an unmowed farm field. (**Exhibit C**, pp. 19-23).

7.      Prior to purchasing the property, the plaintiff was told by an individual in the Berkley assessor's office that the location of the property was adjacent to a hazardous waste site, known as "Bogs Landing." (**Exhibit C**, pp. 27-29).

8.      The Bogs Landing site is an approximate 14-acre portion of a 72.2-acre parcel of undeveloped land located off of North Main Street in Berkley. A due diligence investigation was initiated in 1995 based upon reports that tannery wastes and cesspool wastes had historically been disposed on a portion of the property from the 1930s to the mid-1960s. The investigation identified tannery waste and soil containing various chemicals related to tannery wastes on six-acres within the 14-acre site. (**Exhibit B, ¶¶ 6-8**).

9.      The Massachusetts Department of Environmental Protection ("DEP") and federal Environmental Protection Agency ("EPA") completed numerous investigations to identify the contaminants of concern on the six-acre portion of the Bogs Landing site. These investigations revealed several metals, pentachlorophenol and dioxins in the waste. The primary contaminants of concern were identified to be chromium and dioxin. (**Exhibit B, ¶¶ 7-8**).

10.     On or about May 22, 1998, James Romano, as Chairman of the Berkley Board of Health, received correspondence from the Environmental Toxicology Unit of the Commonwealth's Department of Public Health concerning the Bogs Landing site.  This letter reported that the results of private well samplings in the vicinity of the site did not show evidence of chemical compounds and, as a result, the Department concluded that the Bogs Landing site was not adversely impacting the wells.  However, the Department further reported that "high levels of contaminants are present in site soils, and [Massachusetts Department of Health] supports the environmental regulatory agencies in their efforts to implement appropriate source reduction to prevent opportunities for exposure to site-related contaminants in the future." (**Exhibit B, ¶** 9).

11.     Further, the Department of Public Health reported that, "[h]igh levels of some contaminants have been found to be present in on-site soils, with the potential remaining to impact the groundwater, and therefore, private wells in the future."  (**Exhibit B, ¶** 9).

12.      Between May 1998 and January 2000, the EPA conducted a removal action at the Bogs Landing site, removing approximately 16,000 cubic yards of waste and contaminated soil. (**Exhibit B, ¶** 10).

13.     The Bogs Landing site is located approximately one-quarter mile from the corner of the Dreyfus property.  (**Exhibit C**, pp. 34, 100).

14.     Along the northern edge of the Dreyfus property is located a so-called "haul road" that was used to transport tannery waste from North Main Street to the Bogs Landing dumping site. (**Exhibit C**, pp. 29-31; DEP Letter dated 12/9/03, **Exhibit E**).

15.     The "haul road" is approximately one-quarter mile in length and runs along the northern edge of the Dreyfus property.  (**Exhibit C**, pp. 32-34).

16.     Prior to purchasing the property, the plaintiff engaged in a 45-minute telephone conversation with Julie Hutchinson, a DEP employee who had been involved in the cleanup of the Bogs Landing site.  According to the plaintiff, Ms. Hutchinson informed him that the property that he was considering purchasing was "clean."  (**Exhibit C**, pp. 33, 37-38).

17.     Ms. Hutchinson also advised the plaintiff that, "for [his] best interest," he should consult with the Berkley Board of Health to "see if they had any documentation of any further cleanup or anything in question as far as the lot [he] was interested in buying."  (**Exhibit C**, p. 39).

18.     The plaintiff then spoke with the secretary at the Board of Health who provided him with additional information concerning the property.  (**Exhibit C**, pp. 40-42, 51-52).

19.     During March 2003, the plaintiff then signed the "purchase-and-sale agreement" to purchase the property and then "closed" on the property on April 18, 2003.  (**Exhibit C**, pp. 52, 55-56).

20.     The plaintiff purchased the property with the intention of constructing a "log home" on the rear parcel.  (**Exhibit C**, pp. 57-58).

21.     On or about February 12, 2003, the plaintiff applied to the Berkley Board of Health for a percolation test.  (**Exhibit C**, p. 59-62).

22.     The application was approved and the percolation test was completed.  (**Exhibit C**, pp. 61-62)

23.     During the spring of 2003, the plaintiff, through his agent, applied for a Well Construction Permit, which was approved on or about July, 8, 2003 (**Exhibit C**, p. 67-68).

24.     Subsequently, the plaintiff applied for a building permit.  (**Exhibit C**, pp.66-67).

4

25.     The Building Inspector granted only a foundation permit, allowing the plaintiff to construct a foundation for the house but to do no further construction.  The limited permit was issued on June 4, 2003 at "'owner's risk' for future permits to build upon the foundation." (**Exhibit C**, pp. 66-67; Permit dated 6/4/03, **Exhibit F)**.

26.     On an unknown date after June 6, 2003, the plaintiff applied to the Board of Health for a disposal system construction permit.  (**Exhibit C**, p. 63, 88-89; Copy of Application for Disposal System Construction Permit, **Exhibit G)**.

27.     The Board of Health informed the plaintiff's agent that, before the Board would act on the plaintiff's application, it would require a so-called "21E" test on the property.[1] (**Exhibit C**, p. 63, 70, 78-80, 122).

28.     At a meeting on August 12, 2003, the Board informed the plaintiff directly that, before approving septic design plans, the plaintiff would be required to complete a so-called "21E" soil study.  (**Exhibit C**, p. 80-81).

29.     On August 20, 2003, the Board of Health sent a letter to the plaintiff confirming that, before the Board would approve his septic design plans, the plaintiff would be required to complete a 21E soil study.  The letter further indicated that the reason for the requirement was that, "[t]his property is located on or near the site known to have had tannery waste dumped on it, [and] [t]o ensure the health of future occupants of the site, we need proof that the area is not contaminated."  (**Exhibit C**, p. 81; **Exhibit H)**.

---

[1] Chapter 21E of the Massachusetts General Laws sets out the legal obligations of property owners and others responsible for the contamination to report a chemical spill or release; assess the nature and extent of contamination; take speedy action to address hazards which pose a significant risk of harm; and clean up the contamination.  G.L. c. 21E.

30.     According to the plaintiff, Mr. Romano told him that the Board was requiring the testing because it was a "good idea."  (**Exhibit C**, pp. 79-80).

31.     The other members of the Board agreed with Mr. Romano that the 21E testing was necessary.  (**Exhibit C**, pp. 80-81).

32.     At the time that the Board required the plaintiff to test the soil, Mr. Romano was aware of the results of DEP and EPA findings concerning contamination at the site, as well a previous of test that he understood was performed in August 2002 on the property, that indicated certain levels of arsenic, barium, chromium and lead in the soil.  (**Exhibit B,** ¶¶ 17-18; **Exhibit C**, pp. 112-16).

33.     The Board of Health has an obligation to protect the public from contaminants in the soil and water.  ((**Exhibit B,** ¶¶ 3-5; **Exhibit C**, p. 140).

34.     Under circumstances where the Board has a reasonable belief that contaminants are present in the soil or water, the Board has an obligation to take appropriate action.  (**Exhibit C**, p. 140).

35.     On September 11, 2003, the Board, through its counsel, advised counsel for the plaintiff that a 21E test would not be required, but, instead, the Board would accept results from testing performed by a licensed professional on a designated number of test pits on the property. (**Exhibit B**, p. 101-02; **Exhibit I**).

36.     As of September 11, 2003, the plaintiff knew that the only test required by the Board of Health related to test pits, and that the Board was no longer requiring a 21E soil study. (Deposition of Alan Dreyfus, February 16, 2006, **Exhibit D**, p. 54**).**

37.     On October 6, 2003, the Board issued a letter that confirmed its agreement to accept soil tests from a licensed site professional concerning the Berkley property.  (**Exhibit J).**

38.    The plaintiff refused to conduct either the 21E or the test pit studies.  (**Exhibit C**, pp. 107-112, 122).

39.    Ultimately, DEP agreed to conduct and pay for the testing of the property. (**Exhibit C**, pp. 106-07).

40.    DEP acknowledged that it had never tested the area of Haul Road during the 1995 cleanup and, according to the plaintiff, they decided "that they ought to come out there and test it to make sure that it was clean."  (**Exhibit C**, p. 106).

41.    DEP completed soil testing on November 24, 2003.  (**Exhibit C**, p. 123).

42.    DEP found no evidence of contamination.  (**Exhibit C**, p. 125; DEP Letter dated 12/9/03, **Exhibit E**).

43.    Upon receipt of the DEP letter, the Board of Health approved the plaintiff's disposal system construction plan on January 15, 2004.  **Exhibit K.**

44.    The plaintiff alleges that Romano committed four  acts that were unlawful, negligent or which otherwise violated his rights: (1) Romano withheld approval of the septic system plan without legal cause or authority; (2) Romano put burdensome requirements on the approval of the septic plan not required of other Berkley residents; (3) Romano required testing to be done on the property that was not delineated under the rules and regulations of the Board of Health or state law; and (4) Romano delayed approval of the well permit.  **Exhibit D**, p. 14-17.

45.    The plaintiff can offer no facts to support his allegation that the defendants acted upon his application with any illegal purpose or malicious motivation.  (**Exhibit C**, pp. 126-131; **Exhibit D**, pp. 9-10).

46.    The plaintiff heard several "rumors" why he was "having problems" with the Board of Health, but the plaintiff has testified that he "[doesn't] know how true any of them are." (**Exhibit C**, pp. 46-47, 131).

47.    The plaintiff has no knowledge that any particular Berkley residents were subjected to more burdensome requirements than were imposed upon the plaintiff.  **Exhibit D**, p. 17-18.

The Defendants,
By their attorneys,

**PIERCE, DAVIS & PERRITANO, LLP**


*/s/ Jeffrey M. Sankey*_____
Jeffrey M. Sankey, BBO #551062
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 14, 2006.

*/s/ Jeffrey M. Sankey*_____
Jeffrey M. Sankey

# EXHIBIT "A"



EXHIBIT
No. 6
Tra 1/10/06
PENGAD 800-631-6989



## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                    BRISTOL COUNTY SUPERIOR COURT
                                DOCKET NO.: BRCV2005-00331-B


Alan Dreyfus,                   )
        Plaintiff               )
                                )
                                )  **COMPLAINT**
v.                              )
                                )
James Romano, Town of Berkley, and  )
Board of Health,                )
        Defendants              )


1.      The Plaintiff, Alan Dreyfus, is an individual who owns real property located at 46 R North Main Street in the Town of Berkley, Massachusetts.

2.      The Defendant, James Romano, is an individual who is a resident of the Town of Berkley, Massachusetts.

3.      The Defendant, Town of Berkley, Massachusetts, is a municipality in the Commonwealth of Massachusetts.

4.      The Defendant, Berkley Board of Health, is an agency/board in the Town of Berkley charged with the responsibility of administering the Health Regulations promulgated by the Commonwealth of Massachusetts relating to the disposal of sewage waste incidental to the occupancy of residential property.

5.      The Plaintiff purchased a parcel of land in the Town of Berkley, Massachusetts.

6.      The parcel of land was in an area in the Town of Berkley, Massachusetts that allowed for the construction of a single family residence without a zoning variance in accordance with the applicable local zoning by-laws.

7.     As of 20 February 2005 there exist on the site of the above referenced parcel a substantially structurally complete single family home connected to a private drinking water well and a private sub-surface sewage waste water disposal septic system.

8.     The construction of the above referenced structure is intended to be the Plaintiff's home.

9.     Within the past 2 years all of the necessary permits to allow the Plaintiff to construct the home on the parcel of land referenced above and hereinafter have, as of 20 February 2005, been issued to the Plaintiff.

10.    The Plaintiff contracted with and had professionals experienced in their field all with the proper licenses, certificates and/or authorizations 1. Review, 2. Prepare, and 3. Examine the site, the proposed plans and then file all of the required completed applications, forms, plans, and/or information required to obtain each and every authorization and/or permit required in order to construct said single family home.

11.    Based upon the advice of the above referenced professionals and the collective experience in construction in Massachusetts and in particular rural areas, the Plaintiff paid for and arranged for the components of a log home to be delivered to the site.

12.    Based upon the advice of the professionals and the collective experience the Plaintiff contracted with experienced contractors to dig the well, to install the subsurface sewage disposal system and assemble and construct the home at an agreed upon price expecting the project to be complete within 1 year.

13.    In order to obtain a building permit in the Town of Berkley a permit allowing the construction of a well and sewage septic system is a condition precedent.

14.    The above referenced permits for the well and the subsurface sewage system are obtained from the local Board of Health in accordance with local rules and customs and the regulations promulgated by the Commonwealth of Massachusetts.

15.    The Defendant, Romano, at all time incident to the allegations set forth herein and pertaining in any manner, form or way to the procedures, process, actions and/or inactions applicable to the issuance of any permits/licenses by the Defendant Board of Health and the Defendant Town of Berkley was a duly authorized member and/or Chairman of said referenced Board of Health.

16.    The statues, regulations and any local bylaws pertaining to the construction and permitting of a well and a septic system in the Defendant, Town of Berkley are clear, concise and unambiguous.

17.    The forms and plans required and the procedures utilized by the Defendant Town of Berkley as to each and every single family home ever constructed in said referenced municipality is clear, concise and unambiguous.

18.    State and Federal Government is charged by statute and regulations with the exclusive authority to officially designate and officially identify land in the Commonwealth as being contaminated by oil, hazardous waste and/or chemical agents.

19.    State and Federal Statutes and Regulations set forth the standards to be used and the procedures to be followed to properly identify sites that are contaminated.

20.    State and Federal Statutes and Regulations set forth the quantity of hazardous material allowable in the environment.

21.    At all times incident to the allegations set forth herein the Defendant, Town of Berkley had no local bylaw that in any way referenced hazardous material and/or land contaminated by chemical and/or oil within the boundaries of the municipality.

22.    The Defendant Romano at times incident to allegations set forth herein did personally arrange for the statutory notice of meeting for the Board of Health required by statute to be posted.

23.    The Defendant Romano at times incident to the allegations set forth herein did act as Chairman of the Defendant Board of Health.

24.    The Defendant Romano at times incident to the allegations set forth herein did determine who and what subject matters would be discussed at the meetings of the Defendant Board of Health independent of any vote of said Board.

25.    The Defendant Board of Health did allow the Defendant Romano to not allow formal motions and/or discussion of certain matters without any public discussion in a duly recorded public meeting.

26.    The actions and/or inactions of the Defendant Romano and/or the Defendant Board of Health as set forth herein were regularly discussed across town, privately and publicly and prominently and regularly in the Newspapers published and utilized locally by those individuals residing and working in the municipality.

27.    The Defendant, Town of Berkley, had knowledge and were aware and/or should have had knowledge and should have been aware of the actions and/or inaction of the Defendants, Romano and the Board of Health relating to this Plaintiff and/or the allegation set forth herein.

28.    Plaintiff's Agents filed plans for a sewage disposal system for the parcel.

29.    Said Plans conformed with all state requirements pursuant to Title V.

30.    Plaintiff through his Agents applied for a well permit and the Town of Berkley would not entertain or notice applications per order of Chairman Romano.

31.    Said order was made by Chairman Romano without formal notice of Public Hearing or vote of the Board.

32.    The Board of Health of the Town of Berkley does not have/ did not have rules and regulations duly adopted at the time of these actions by Romano that would allow him to take action in the manner referenced herein.

33.    The Board of Health has not adopted rules and regulations that would allow them to require an applicant to do a 21E environmental Hazard evaluation of the property.

34.    No town bylaw exists empowering any town agency to require such examination and certification.

35.    As a condition precedent to and prior to any formal consideration by the Board of Health of the Plaintiff's request and application for various required permits to site a well and a septic system the Plaintiff was requested and required to certify the above referenced 8+ acre site upon which he has substantially constructed a single family home was free of any contamination.

36.    The above referenced site has never been formerly identified by any federal and/or state government as being contaminated.

37.    Prior to and as a condition precedent to the purchase of the site herein referenced the Plaintiff and other professionals researched all records required to determine the suitability of the site for a home and to discover any evidence of contamination that may have been present on site.

38.    No one identified herein as Plaintiff and/or Defendant has ever been able to find any records of contamination on the site of the Plaintiff's home.

39.    For over approximately 1 year the Defendant Romano did refuse to allow the Plaintiff to even discuss the required permits with the Board of Health.

40.    For over approximately 1 year the Defendant Romano did refuse to consider the applications of the Plaintiff for the required permits.

41.    For over approximately 1 year the Defendant Board of Health did not discuss the merits of the Plaintiff's applications for the required permits.

42.    For over approximately 1 year the Defendant Town of Berkley allowed the Plaintiff's application for the permits needed from the Board of Health to never be considered on the merits.

FROM : BERKLEY SELECTMEN          FAX NO. : 508-822-4603          Apr. 11 2005 02:23PM P6

43. The Defendant Romano did cause the Plaintiff to be aware that he personally and individually would not allow any action with regards to the well and/or septic system issues until he personally was satisfied that the site referenced herein was not contaminated by oil and/or chemicals.

44. The Defendant Board of Health did not take any action as to the Plaintiff's request and application for the required permits until approximately 1 year had passed and the Board of Health was satisfied that the referenced site was not contaminated.

45. As of 20 February 2005, none of the Defendants have ever set forth quantifiable and/or qualifyable standards for contamination by oils and/or chemicals of land within the boundaries of the municipality and/or set forth acceptable procedures to determine same.

46. As the result of delay, the Plaintiff's components that were delivered to the site were badly damaged in spite of the Plaintiff's efforts to protect same causing a diminution in value

47. As the result of the delay contracts which the Plaintiff anticipated to result in a cost effective construction of his home needed to be renegotiated at higher costs.

48. As a result of the delay the Plaintiff expended much more money for housing rather than live in his new home.

49. As a result of the delay the Plaintiff has incurred banking and finance expense that far exceeded the original and/or anticipated budget.

50. As the direct result of the Defendants unlawful, unwarranted, uncaring and intentional actions and/or inactions the Plaintiff has been caused to lose and/or spend large sums of money.

51. The actions and/or inaction of the Defendants consciously or unconsciously, intending or not intending, purported to operate and subject the Plaintiff to statutes, regulations and bylaws that did not and do not exist.

52. The Plaintiff has secured the services advice and representation of attorneys and has incurred the expense related.

53. The Plaintiff causes the statutory required notice to be delivered by US Mail at no cost to the Defendants on 1 July 2004.

54. Over 6 months ago a letter/demand was mailed to 1. The Board of Selectman, 2. Town Clerk, 3. Town Counsel, 4. Finance Committee, and 5. Board of Health that set for the issues addressed herein in detail, clearly setting forth damages in excess of $100,000.00, the nature of the claim and a willingness to discuss settlement prior to litigation.

55.    The Defendants have not issued a written response to said demand and/or contacted the Plaintiff.

56.    The Plaintiff's rights pursuant to both Federal and State constitutions and statutes have been violated.

57.    Wherefore the Plaintiff respectfully request judgment the award of monetary damages to include attorney's fees, cost and interest.


Attorneys for the Plaintiff



Attorney John P. Long
722 Eastern Avenue
Fall River, MA 02723
(508) 674-4444
BBO# 304210




Attorney Brain Corey Jr.
1041 Main Road
Westport, MA 02790
(508) 636-8861
BBO# 632973

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN DREYFUS,<br>       Plaintiff,<br><br>    v.<br><br>JAMES ROMANO, TOWN OF<br>BERKLEY and BOARD OF HEALTH,<br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)    DOCKET NO.: 05 10876 WGY<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF JAMES ROMANO

1.      My name is James Romano and I have been a member of the Town of Berkley Board of Health since 1992.

2.      At all times relevant to the Plaintiff's Complaint, I have served as the Chairman of the Berkley Board of Health.

3.      The mission of the Board of Health is to preserve and protect the health of the community, including protecting the public against environmental hazards.

4.      In regard to sewage disposal, the responsibilities of the Board of Health include review of plans for individual septic systems, and to consider and act upon applications for permits to install septic systems.

5.      In regard to drinking water, the responsibilities of the Board of Health include oversight and monitoring of private wells, and the performance of activities necessary to prevent contamination of drinking water supplies.

6.      In 1995, the U.S. Environmental Protection Agency ("EPA") and other state agencies launched a due diligence investigation of a certain parcel of land within the Town

located off of North Main Street based upon reports that the site had been used as a dumping

ground for tannery and cesspool waste on a regular basis between the 1930s and mid-1960s.

This site is referred to as "Bogs Landing," and it comprises an approximate 14-acre portion of a

72.2-acre parcel of undeveloped land.

7.    I am familiar with the Massachusetts Department of Public Health's "Health

Consultation Report" dated October 30, 1996 that summarizes the initial findings of

contamination at the Bogs Landing site, including positive soil test samples for chromium,

dioxin and other metals.  This report indicated that "material was moved around the site after the

dumping and hence, elevated concentrations might be found in locations other than the waste

piles."  A copy of this report is attached hereto as **Tab 1.**

8.    The Massachusetts Department of Environmental Protection ("DEP") and the

EPA completed numerous investigations to identify the contaminants of concern on the six-acre

portion of the Bogs Landing site.  These investigations revealed the presence of several metals,

pentachlorophenol and dioxins in the waste.  The primary contaminants of concern were

identified to be chromium and dioxin.

9.    On or about May 22, 1998, as Chairman of the Berkley Board of Health, I

received correspondence from the Environmental Toxicology Unit of the Commonwealth's

Department of Public Health concerning the Bogs Landing site.  This letter reported that the

results of private well samplings in the vicinity of the site did not show evidence of chemical

compounds and, as a result, the Department concluded that the Bogs Landing site was not

adversely impacting the wells.  However, the Department further reported that "[h]igh levels of

some contaminants have been found to be present in on-site soils, with the potential remaining to

impact the groundwater, and therefore, private wells in the future."  As a result, the Department

2

indicated that it "continues to support the environmental regulatory agencies in their efforts to implement appropriate source reduction to prevent opportunities for exposure . . . to site-related contaminants in the future." A copy of this correspondence is attached as **Tab 2.**

10.    I am aware that, between May 1998 and January 2000, the EPA conducted a removal action at the Bogs Landing site, removing approximately 16,000 cubic yards of waste and contaminated soil.

11.    I am aware that the plaintiff, Alan Dreyfus, purchased property located at 46R North Main Street in Berkley (the "Dreyfus property").

12.    The Dreyfus property is located approximately one-quarter mile from the Bogs Landing property.

13.    Along the northern edge of the Dreyfus property is located a so-called "haul road" that I understand was used to transport tannery waste from the main access road of North Main Street to the Bogs Landing dumping site.

14.    The "haul road" is approximately one-quarter mile in length and runs along the northern edge of the Dreyfus property.

15.    On an unknown date after June 6, 2003, Mr. Dreyfus applied to the Board of Health for a disposal system construction permit.

16.    On or before August 12, 2003, the Board informed Mr. Dreyfus that, prior to approving the construction of the disposal system, the Board would require a 21E test on the property.

17.    When I voted, along with other Board members, to require a 21E test on the Dreyfus property, I considered information known to me concerning the site, including the information set forth in the documents attached hereto as Tabs 1 and 2.

3

18.     I was also aware of previous testing that I understood was performed in August 2002 on the plaintiff's property that indicated certain levels of arsenic, barium, chromium and lead in the soil. **Tab 3.**

19.     Later, in response to the plaintiff's objection, the Board modified its position to require results from soil tests performed by a licensed professional on a designated number of test pits on the property.

20.     Subsequently, I became aware that DEP conducted soil tests on the plaintiff's property.

21.     Upon receipt of the DEP letter indicating that no contaminants had been found, the Board of Health approved the plaintiff's disposal system construction plan on January 15, 2004.

SUBSCRIBED AND SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS ___ DAY OF MARCH 2006.

JAMES ROMANO

4

**Tab 1**

# HEALTH CONSULTATION

Proposed Bogs Landing Site
Berkley, Massachusetts

October 30, 1996

Bureau of Environmental Health Assessment
Massachusetts Department of Public Health
Boston, Massachusetts

## I.    BACKGROUND

The U.S. Environmental Protection Agency (USEPA) Region I requested that the Massachusetts Department of Public Health (MDPH) conduct a health consultation regarding the potential public health threats posed by the proposed Bogs Landing site in Berkley, Massachusetts (USEPA 1996). There was concern that the chemicals detected in the soil and groundwater during the permitting process for the Bogs Landing housing development and subsequent investigations by environmental agencies could pose a public health threat. Most notable was the potential threat to residents that consumed water from private wells surrounding the site or to residents that accessed the site. While this development plan is no longer being actively pursued (USEPA 1996, MDEP 1996a), there are still concerns about past, present, and future opportunities for exposure to the compounds detected at the site. The MDPH completed this health consultation as part of its cooperative agreement with the U.S. Agency for Toxic Substances and Disease Registry (ATSDR).

## II.    DISCUSSION

The Berkley Board of Health (BBOH) has reported that the site was a dumping ground for tannery and cesspool waste on a weekly basis between the 1930s and the mid-1960s (BBOH 1996). USEPA has estimated that there are approximately 25 suspected waste piles on the site (USEPA 1996). Based on reports from local residents, it is suspected that the tannery waste was in a sludge form when it was dumped but was pushed into piles by earth-moving equipment afterwards (BBOH 1996).

The site covers an unknown portion of the approximately 500 acre area bounded by North Main, Burt, Jerome, Pine, Porter, and Locust streets in Berkley, Massachusetts. Contamination has been detected in an area ("the site") centered approximately 0.3 mile east of North Main Street and 0.4 mile north of the intersection of North Main and Porter streets (Figure 1). The USEPA suspects that contamination could encompass an area as large as several acres (USEPA 1996). The actual horizontal extent of the contamination in both soil and groundwater has not been fully determined.

The BBOH reported that in the past, individuals frequently entered the site (BBOH 1996). They could have come in contact with the contaminated soil by skin contact or ingestion when the site was less vegetated. Older children (e.g., teenagers) used to play after school in the open space created by the dumping (a school was less than one mile from the site until 1987 when it was moved to a different building farther away). People hunted in the wooded area. Dead trees in the area of the dumping were cut and used for firewood (BBOH 1996).

At the present time, access to the site is less frequent because the road from North Main Street to the site is impassable and much of the site is overgrown (BBOH 1996). Hiking and riding trails are evident in the vicinity of the site but don't appear to be frequently accessed (USEPA 1996). During a visit to the site in September 1996, MDPH staff found the site to be wooded and overgrown with thick vegetation, but

1

accessible. MDEP has reported that the vegetation at the site was less dense in May 1995 (MDEP 1996a).

Approximately four hundred and twenty eight (428) of the 5175 town residents currently live along the five streets surrounding the site (BTC 1996). All the houses in the town of Berkley receive drinking water from private wells. The depths of the wells in town fall within an approximate range of 10 to 500 feet (BBOH 1996). The closest residences to the site are on the east side of North Main Street, approximately 0.3 mile west of the site. The Town Hall, fire station, police station, and town library are all less than approximately 0.6 mile from the site (Figure 1). These town offices are supplied drinking water by a central well located in the town common.

To the north of the site but still south of Burt Street, the Silveira Cranberry Corporation (SCC) has been reported to be developing a parcel of land to grow cranberries (BBOH 1996). On this property, the SCC is reported to be building a reservoir, a cranberry bog, and a wetlands area (BBOH 1996). Citizens have expressed concern that the cranberry bog operations may affect the hydrogeology (e.g., groundwater flow patterns) of the area, potentially drawing contaminated groundwater from beneath the site toward residential wells. In June 1995, Carr Research Laboratory, Inc. produced a report stating that the development activities on the SCC property should not affect the hydrology of the surrounding region (CRLI 1995). Citizens, however, have reported that stream flows and groundwater table elevations have been visibly affected during periods of intense groundwater extraction on the SCC property. Extraction of large volumes of groundwater near the site has the potential to alter the shallow groundwater flow patterns in the area (USGS 1996)

In February 1995, as part of the local permitting process for the proposed Bogs Landing development, the BBOH required the developer to install three monitoring wells and to analyze groundwater and soil samples from the site (MDEP 1996a). Subsequently, the developer did not proceed with further site plans. Any data from this sampling that may have been available privately to the developer were not released to the BBOH and, hence, could not be evaluated by the MDPH for this report (MDEP 1996a).

In the spring of 1996, the MDEP requested that the USEPA assist with additional environmental sampling at the site. In May, June, and July 1996, surface soil and waste material (from 0 to 3 inches depth) were sampled by the USEPA with assistance from the MDEP (Table 1). Most of the soil samples (11 out of 12) were taken from areas suspected of being either waste material or soil contaminated by waste material (MDEP 1996a). All the soil samples were collected in the area around the monitoring wells (within 200 feet) (MDEP 1996a). Eleven of the 12 soil samples collected in 1996 were analyzed for metals. Three of the 12 soil samples were analyzed for volatile organic compounds (VOCs). Nine of the 12 soil samples were analyzed for base-neutral-acid (BNA) extractable organic compounds. One of the 12 samples from the most prominent waste pile was analyzed for dioxin and the chromium speciation. As part of this health consultation, the MDPH compared the concentrations of contaminants in

2

soils and groundwater to health screening values (see Appendix A for explanation of the screening values).

In soils, the maximum concentration of antimony, chromium, pentachlorophenol, and dioxin exceeded at least one of the health-based screening values. There are no health-based screening values for lead and copper in soils but these metals were present at concentrations above the Massachusetts background soil concentrations estimated by MDEP (99 and 38 mg/kg, respectively) (MDEP 1995). The results of this sampling are as follows (see Table 1 and Appendix B for additional information on these compounds):

- Antimony was detected in 2 of 11 samples. The maximum concentration was 1,600 mg/kg and was in a sample taken from a known waste pile. The other sample showed a concentration (54 mg/kg) nearly two orders of magnitude lower.

- Pentachlorophenol was detected in 1 of 9 samples (11 mg/kg) and was in a sample taken from a known waste pile.

- Chromium was detected in 9 of 12 samples. The maximum concentration (93,100 mg/kg) was detected in a suspected waste pile, and all other chromium concentrations in soil (28,000; 4,500; 6,400; 5,800; 800; 13,000; 2,700; and 3,000 mg/kg) were below the RMEG for trivalent chromium (50,000 mg/kg).

- Dioxin was tested in only one soil sample, which was taken from the same known waste pile as where the pentachlorophenol was detected. The dioxin concentration detected in the sample (24.7 ug/kg Toxicity Equivalence) was well above background levels reported in the literature.

- Lead was detected in 5 of 11 samples. The maximum concentration (12,000 mg/kg) was detected in a suspected waste pile. The second and third highest detections (1,000 and 160 mg/kg) were approximately one and two orders of magnitude lower than the maximum value, respectively.

- Copper was detected in 6 of 11 samples. The maximum concentration (160,000 mg/kg) was detected in a suspected waste pile. The second and third highest detections (2,400 and 500 mg/kg) were approximately two and three orders of magnitude lower than the maximum value, respectively.

Since these samples were taken from waste piles, they may well overestimate the average concentration to which a person might be exposed over the whole site. However, material was moved around the site after the dumping (BBOH 1996) and hence, elevated concentrations might be found in locations other than the waste piles.

In May 1995, the MDEP collected three groundwater samples from the three monitoring wells that had been installed by the developer. These samples were analyzed for a wide variety of metals and organic compounds. The soil analyses detected some compounds with the capacity to leach to the groundwater (e.g.,

3

chromium, lead, pentachlorophenol). Therefore, in July 1996, the USEPA, with assistance from the MDEP, collected three groundwater samples from the three wells that had been installed by the developer on the site. These samples were analyzed for metals, chromium speciation, VOCs, and BNA organics. The results of the groundwater samples are presented in Table 2.

In the groundwater beneath the site, the maximum concentration of arsenic, beryllium, chromium (total), lead, manganese, and vanadium exceeded at least one health-based screening value. With the exception of arsenic, all of these compounds were detected at much higher concentrations in 1996 than in 1995. For example, chromium was not detected (detection limit of 10 ug/L) in 1995, but showed a concentration of 3390 ug/L in 1996. The reasons for the higher concentrations in 1996 need further investigation.

In September 1996, the MDPH made funds available to test private, residential drinking water wells. Chromium (hexavalent and total) and lead (total), the only two compounds detected at elevated concentrations in both the soil on the site and in groundwater beneath the site, were measured in the private well samples to provide an indication of whether chemicals from the site could be contaminating neighboring private wells (chromium and lead are expected to be more mobile than relatively insoluble organic compounds, such as dioxin, that have been detected at the site). The BBOH, in collaboration with the MDPH, collected household water samples from 33 private wells on North Main, Burt and Jerome streets (Figure 2). The houses sampled were chosen based on their proximity to either the site or to a waterway which drains the site. If possible, the sample was taken prior to any filtration unit.

The results of this sampling are presented in Table 3. Hexavalent chromium was not detected in any of the 33 private wells tested. Total chromium was detected in one private well at a concentration below its Massauchesetts Maximum Contaminant Level (MMCL). Lead was detected in 16 of the 33 houses, but all the detections were less than the MMCL action level for lead. There were no obvious site-related pattern of chromium or lead contamination in the private wells.

Based on the available data, the MDPH believes that current opportunities for exposure to site-related compounds in soil and groundwater are not likely. Testing of private drinking water at nearby residences did not reveal any chromium or lead above standards established for public drinking water supplies. Consequently, it is unlikely that other site-related compounds would be contaminating these private wells at this time. Trespassing on the site appears to be less frequent than in the past and the site is heavily vegetated, thereby limiting current opportunities for exposure to the contaminants found in the soil. As a result, we do not expect adverse health effects to result from current exposures to the contamination found at the site.

However, the data are too limited at this time to evaluate opportunities for past exposure (and hence potential health effects) via soil, drinking water, or other possible pathways (e.g., contact with surface water). For example, we do not know whether concentrations of the four chemicals found in soil above health-based screening levels

4

(i.e., antimony, pentachlorophenol, chromium, and dioxin) are representative of concentrations across the site.

The private well testing performed by the BBOH and the MDPH addressed immediate concerns about opportunities for exposure to compounds in drinking water. However, these data are not adequate to evaluate opportunities for future exposures, particularly because of the lack of knowledge of groundwater flow patterns in the area. Further characterization of chemical distributions in the site's groundwater and the hydrogeology of the area should help in evaluating opportunities for future exposures. Likewise, although current conditions are such that the site does not appear to be used with the same intensity as in the past, should site conditions change in the future, opportunities for exposure would increase and therefore concern for health effects would also increase.

These evaluations of potential opportunities for exposure are based on limited data. Additional site characterization (e.g., distribution of constituents in soil and groundwater, hydrogeological and geochemical parameters) would be necessary to better evaluate potential past, present, and future opportunities for exposures.

Because some of the compounds found on the site (e.g., dioxin) are considered to be carcinogens, available cancer incidence information as reviewed for the town of Berkley. Cancer incidence was evaluated for the years 1982 through 1992, the time period for which the most complete data is available. Readily available cancer incidence data were obtained from the Massachusetts Cancer Registry (MCR) of the MDPH, Bureau of Health Statistics, Research and Evaluation (MCR 1995). The incidence of all cancers for the 11 year period for Berkley was significantly lower than what would have been expected based on state-wide comparisons.

Cancers reported in the literature to be possibly related to dioxin exposures (i.e., non-Hodgkin's lymphoma and soft tissue sarcoma) did not occur more frequently than expected based on state-wide comparisons. No cases of soft tissue sarcoma occurred in Berkley during the 1982 to 1992 period. The individual cases of non-Hodgkin's lymphoma were descriptively analyzed to determine if there was an indication of a disproportionate number of cases near the site. No unusual concentration of individuals with non-Hodgkin's lymphoma was observed.

## III. CONCLUSIONS

1. Although elevated levels of some compounds were found in groundwater directly beneath the site in 1996, private well testing of nearby residences did not reveal any compounds above drinking water standards established for public supplies.

2. The MDPH believes that opportunities for exposure to compounds in soil on the site currently are not likely because frequent recreational use of the site is not evident and the site is heavily vegetated. However, should additional sampling reveal that some of the compounds found at elevated levels in waste piles are also found at similar concentrations across the site, then health effects may be possible with sufficient opportunities for exposure.

3. Under past conditions, MDPH believes that there were greater opportunities for exposure to compounds in soil at the site because the site was more accessible, recreational use was reported to be more frequent, and contaminated surface soils were more exposed. Because information on the potential historical distribution or concentrations of site-related compounds in the groundwater beneath the site is not available, it is not possible to conclude that there were no past opportunities for exposure to compounds in the groundwater. The likelihood that adverse health effects occurred from these potential opportunities for exposure in the past cannot be evaluated with confidence based on the information that is currently available.

4. Based on findings of elevated concentrations of chemicals in on-site media, further site characterization by environmental regulatory agencies is needed to provide a more representative understanding of the concentrations and distributions of chemicals on the site and the hydrogeology of the area. This site characterization work will assist the MDPH to evaluate opportunities for past as well as future opportunities for exposure and to address potential health concerns.

5. Available health information from the Massachusetts Cancer Registry in the MDPH indicates that cancer incidence was not elevated for the town of Berkley compared to what would be expected based on state-wide comparisons during the 1982 to 1992 period, the time period for which the most complete data are available. Cancers reported in the scientific literature to have been associated with dioxin exposure (i.e., non-Hodgkin's lymphoma and soft tissue sarcoma) have not occurred more frequently than expected in Berkley based on state-wide comparisons. In addition, a review of non-Hodgkin's lymphoma and soft tissue sarcoma cancer incidence by household address does not indicate a concentration of cancer cases near the site.

## IV.    RECOMMENDATIONS

1. As a precaution until further environmental investigation takes place, the MDPH recommends that residents not use the site for recreation and that access points to the site be posted.

2. The MDPH supports the efforts of the environmental regulatory agencies to further characterize the nature and extent of the contamination at the site and the hydrogeology of the area. MDPH staff can assist the environmental regulatory agencies with plans for additional site investigations.

3. The MDPH will review any additional environmental data which is collected from the site and prepare additional health consultations.  If further site characterization reveals that the currently available data are representative of the site, this would indicate the need for site remediation.

*Post area No Trespass*

## CERTIFICATION

The Health Consultation for Bogs Landing Site, Berkley, Massachusetts was prepared by the Massachusetts Department of Public Health under a cooperative agreement with the Agency for Toxic Substances and Disease Registry (ATSDR). It is in accordance with approved methodology and procedures existing at the time the Health Consultation was initiated.

Tina Forrester, Ph.D.
Technical Project Officer, SPS, SSAB, DHAC

The Division of Health Assessment and Consultation, ATSDR, has reviewed this Public Health Assessment and concurs with its findings.

Sharon Williams-Fleetwood
Chief, SSAB, DHAC, ATSDR

8

## V. REFERENCES

Arthur, M.F., and Frea, J.I., 1989, 2,3,7,8-Tetrachlorodibenzo-p-dioxin: Aspects of its important properties and its potential biodegradation in soils, *Journal of Environmental Quality*, Volume 18, Number 1, pp. 1-11.

ATSDR, 1989, Toxicological Profile for 2,3,7,8-Tetrachlorodibenzo-p-Dioxin, ATSDR/TP-88/23, U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Atlanta, Georgia, June 1989.

ATSDR, 1992, Toxicological Profile for Antimony, ATSDR/TP-91/02, U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Atlanta, Georgia, September 1992.

ATSDR, 1993a, Public Health Assessment Guidance Manual, U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Lewis Publishers, Boca Raton, Florida, 1993.

ATSDR, 1993b, Toxicological Profile for Chromium, ATSDR/TP-92/08, U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Atlanta, Georgia, April 1993.

ATSDR, 1993c, Toxicological Profile for Lead, ATSDR/TP-92/12, U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Atlanta, Georgia, April 1993.

ATSDR, 1994, Toxicological Profile for Pentachlorophenol, ATSDR/TP-93/13, U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, Atlanta, Georgia, May 1994.

BTC, 1996, Personal communication from the Berkley Town Clerk.

BBOH, 1996, Personal communication from Jim Romano, Steve Rapoza or Scott Fournier of the Berkley Board of Health.

CRLI, 1995, Hydrologic and Permit Review, Proposed Excavation and Earth Removal for Cranberry Bogs and Water Supply Pond between Jerome Street and North Main Street, Berkley, Mass., Carr Research Laboratory, Inc., 17 Waban Street, Wellesley, Massachusetts, 17 June 1995.

Kimbrough, R.D., Falk, H., and Stehr, P., 1984, Health implications of 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD) contamination of residential soil, *Journal of Toxicology and Environmental Health*, Volume 14, pp. 47-93.

MCR, 1995, Cancer Incidence in Massachusetts 1982-1992: City/Town Supplement, Massachusetts Cancer Registry, Bureau of Health Statistics, Research and Evaluation, Massachusetts Department of Public Health, November 1995.

MDEP, 1995, Guidance for Disposal Site Risk Characterization, Massachusetts Department of Environmental Protection, Bureau of Waste Site Cleanup and Office of Research and Standards, July 1995.

MDEP, 1996a, Personal communication from Julie Hutcheson, Emergency Response Division, Massachusetts Department of Environmental Protection, Southeast Regional Office.

MDEP, 1996b, Annual Update to the Massachusetts Drinking Water Standards and Guidelines for Chemicals in Massachusetts Drinking Waters, Office of Research and Standards, Massachusetts Department of Environmental Protection, May 1996.

Puri, R.K., Clevenger, T.E., Kapila, S., Yanders, A.F., and Malhotra, R.K., 1989, Studies of parameters affecting translocation of tetrachlorodibenzo-p-dioxin in soil, *Chemosphere*, Volume 18, Numbers 1-6, pp. 1291-1296.

Reed, L.W., Hunt, G.T., Maisel, B.E., Hoyt, M., Keefe, D., and Hackney, P., 1990, Baseline assessment of PCDDs/PCDFs in the vicinity of the Elk River, Minnesota generating station, *Chemosphere*, Volume 21, pp. 159-171.

Travis, C.C., and Hattemer-Fry, H.A., 1991, Human exposure to dioxin, *Science of the Total Environment*, Volume 104, pp. 97-127.

USEPA, 1996, Personal communication from Gary Lipson, On-Scene Coordinator, Office of site Remediation and Restoration, USEPA Region 1, Boston, Massachusetts.

USGS, 1996, Personal communication from Gardner Bent, U.S. Geological Survey, Marlborough, Massachusetts.

## VI.  DOCUMENTS REVIEWED

1. Memo of 4-Jun-96 from Gary Lipson, On-Scene Coordinator, Office of site Remediation and Restoration, USEPA Region 1 to the Region 1 representative for ATSDR requesting a health consultation for the proposed Bogs Landing site. The sampling results from one soil sample were included in this memo.

2. Three data packets (1st, 2nd, and 3rd rounds) containing soil and groundwater data from the site collected by the USEPA during the summer of 1996. MDPH received these data packets at a meeting with Gary Lipson, On-Scene Coordinator, Office of site Remediation and Restoration, USEPA Region 1 on 6-Sep-96.

3. Memo from Richard F. Packard, MDEP, Southeast Region Office to Berkley Board of Selectmen on 20-Sep-96, Attn: Mr. George Moitoza, regarding "Proposed Berkley Bog's Landing, property located off North Main Street, RTN #4-11247".

4. Report by Carr Research Laboratory, Inc., "Hydrologic and Permit Review, Proposed Excavation and Earth Removal for Cranberry Bogs and Water Supply Pond between Jerome Street and North Main Street, Berkley, Mass.", 17-Jun-96. Received by MDPH from the BBOH on 22-Sep-96.

5. Report by Carr Research Laboratory, Inc., "Second Permit Review for Cranberry Bog Water Supply Pond between Jerome Street and North Main Street, Berkley, Mass.", 18-Jun-96. Received by MDPH from the BBOH on 22-Sep-96.

6. Fax from Gary Lipson, On-Scene Coordinator, Office of site Remediation and Restoration, USEPA Region 1 containing the BNA organics analyses of the three groundwater samples collected by USEPA during the summer of 1996. Received by the MDPH on 25-Sep-96.

7. Memo from Richard F. Packard, MDEP, Southeast Region Office to Berkley Board of Selectmen, Attn: Mr. George Moitoza, on 25-Sep-96, regarding "Correction to September 20, 1996 Letter".

8. Letter from Andrew Gottlieb, Director, Office of Watershed Management, MDEP to Ronald Silveira, Silveira Cranberry Corporation, on 30-Aug-96, regarding "Berkley-Enforcement Order pursuant to the Water Management Act". Received by MDPH from MDEP on 7-Oct-96.

9. Fax from Julie Hutcheson, MDEP, to Phil Trowbridge, MDPH, on 8-Oct-96, containing the laboratory data sheets from the analysis of groundwater samples collected by the MDEP during the spring of 1995.

**Table 1:** Summary of soil sampling results from the proposed Bogs Landing Site with comparison values. Concentrations of metals are listed as mg/kg by wet weight unless otherwise noted. Concentration of organic compounds and all comparison values (inorganic and organic) are reported as mg/kg by dry weight unless otherwise noted[6].

| Compound | Detects/ Samples | Min | Max | Comparison Values |
|---|---|---|---|---|
| Antimony | 2/11 | 54 | 1,600 | RMEG(child) = 20<br>RMEG(adult) = 300 |
| Chromium | 9/12 | 800 | 93,100[3,4] | RMEG(child) = 50,000[1]<br>RMEG(adult) = 700,000[1] |
| Hexavalent Chromium | 1/1 | 5.32[3,4] | 5.32[3,4] | RMEG(child) = 300<br>RMEG(adult) = 4,000 |
| Copper | 6/11 | 250 | 160,000 | NA |
| Lead | 5/11 | 150 | 12,000 | NA |
| Zinc | 6/11 | 200 | 1,400 | EMEG(child, int.) = 20,000<br>EMEG(adult, int.) = 200,000 |
| Zirconium[2] | 1/11 | NR | NR | NA |
| 1,2,4-trichlorobenzene | 1/9 | 1.4[4] | 1.4[4] | RMEG(child) = 500<br>RMEG(adult) = 7,000 |
| bis (2-ethylhexyl) phthalate | 2/9 | 2.9[4,5] | 12[5] | NA |
| di-n-octylphthalate | 1/9 | 104 | 104 | NA |
| pentachlorophenol | 1/9 | 11 | 11 | CREG = 6<br>EMEG(child, int) = 50<br>EMEG(adult, int) = 700 |
| Dioxin Toxicity Equivalence (TEQ) (in ug/kg dry weight) | 1/1 | 24.7[4] | 24.7[4] | EMEG(child, chronic) = 0.05 ug/kg[7]<br>EMEG(adult, chronic) = 0.7 ug/kg[7]<br>CDC action level for residential soils = 1 ug/kg[7] |

NA = Not available
NR = Concentration not reported.
ND(value) = Not detected at the detection limit shown in the parentheses.

1. RMEG for trivalent chromium.
2. Zirconium was detected in one sample but its concentration was not quantified. It was estimated to be "> 5000 mg/kg" by MDEP in its letter to the Berkley Selectmen of 20-Sep-96.
3. The chromium concentration is soil samples was reported on a wet weight basis for all but one of the samples. Consequently, the distribution of chromium concentrations in this table is a combination of dry and wet weight values. The maximum concentration, 93100 mg/kg, is the one sample where the chromium concentration was reported on a dry weight basis. The hexavalent chromium concentration in this same sample, 5.32 mg/kg, was also reported on a dry weight basis
4. Estimated concentration.
5. All of the detections of bis(2-ethylhexyl) phthalate were associated with contamination of the laboratory blank by this chemical.
6. Comparing measured concentrations per wet weight of soil to comparison values per dry weight of soil may under estimate the potential health risks associated with exposure. However, because of the limited data available, in this consultation, comparison values will only be used to gauge the relative importance of compounds not to eliminate compounds from further consideration.
7. Comparison value for 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD).

**Table 2:** Summary of groundwater sampling results from the proposed Bogs Landing Site. The groundwater concentrations and comparison values have units of ug/L unless otherwise noted.

| Compound | Detects/ Samples | Min | Max | Comparison Values |
|---|---|---|---|---|
| Arsenic | 1/6 | 2 | 2 | CREG = 0.02<br>EMEG (child, chronic) = 3<br>EMEG (adult, chronic) = 10<br>MMCL = 50 |
| Barium | 3/3 | 72.4 | 396 | RMEG(child) = 700<br>RMEG(adult) = 2,000<br>MMCL = 2,000 |
| Beryllium | 1/6 | 5.1 | 5.1 | CREG = 0.08<br>MMCL = 4<br>RMEG(child) = 50<br>RMEG (adult) = 200 |
| Chromium (Total) | 3/6 | 93.4 | 3,390 | MMCL = 100 |
| Cobalt | 2/3 | 60.2 | 86.4 | NA |
| Copper | 3/6 | 6 | 179 | MMCL = 1,300 (action level) |
| Lead | 2/6 | 96.1 | 154 | MMCL = 15 (action level) |
| Manganese | 3/3 | 483 | 3,010 | RMEG(child) = 50<br>RMEG (adult) = 200 |
| Nickel | 2/6 | 90.4 | 164 | RMEG(child) = 200<br>RMEG (adult) = 700 |
| Vanadium | 2/3 | 82.1 | 146 | EMEG(child, int.) = 30<br>EMEG (adult, int.) = 100 |
| Zinc | 6/6 | 33 | 482 | EMEG(child, int.) = 3,000<br>EMEG (adult, int.) = 10,000 |
| bis (2-ethylhexyl) phthalate | 4/6 | 1[2] | 11[2] | NA |
| diethylphthalate | 1/6 | 1[1] | 1[1] | EMEG (child, int.) = 60,000<br>EMEG (adult, int.) = 200,000 |
| Dioxin Toxicity Equivalence (TEQ) | 0/0 | Not Analyzed | Not Analyzed | EMEG (child, chronic) = 0.01 ng/L[3]<br>EMEG (adult, chronic) = 0.04 ng/L[3]<br>MMCL = 0.03 ng/L[3] |

ND(value) = The analyte was not detected at the detection limit shown in the parentheses.
NA = Not available

1. Estimated concentration.
2. All the detections of bis (2-ethylhexyl) phthalate were associated with contamination of the laboratory blank.
3. Comparison value for 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD).

13

**Table 3:** Summary of results from private well samples

| Compound | Detects/Samples | Minimum Concentration (ug/L) | Maximum Concentration (ug/L) | MMCL (ug/L) |
|---|---|---|---|---|
| Total Chromium | 1/33 | 41 | 41 | 100 |
| Hexavalent Chromium | 0/33 | ND(50) | ND(50) | 100[1] |
| Total Lead | 16/33 | 1.3 | 11 | 15[2] |

ND(value) = The analyte was not detected at the detection limit shown in the parentheses.

1. The MMCL for chromium was derived assuming that all the chromium in the water was in its hexavalent form. Therefore, the MMCL for total chromium is also applicable for hexavalent chromium.
2. MMCL action level for lead.

14



Figure 1: Topographic map of the site area.

Source: US Geological Survey Map # 41071-G1-TM-025, "Somerset, Massachusetts", 1985

FIGURE 2:
Locations of Private Well Samples

Berkley, MA

# VII.  APPENDIX A

In the final column of Tables 1, 2 and 3, the available health-based screening values that are relevant to each chemical are listed. Health assessors use a variety of screening values to help decide whether chemicals may need further evaluation: Environmental Media Evaluation Guide (EMEG), Reference Dose Media Evaluation Guide (RMEG), and Cancer Risk Evaluation Guide (CREG). If the concentration of a chemical exceeds these health-based screening values, adverse health effects are not necessarily expected. Rather, these screening values help in selecting chemicals for further consideration. For example, if the chemical's groundwater concentration is greater than the EMEG for water, the potential for exposure to the chemical should be further evaluated to determine whether health effects may be possible. Conversely, if the concentration is less than the EMEG, it is unlikely that exposure would result in adverse health effects (ATSDR 1993a). The MDEP has established a Maximum Contaminant Level or Action Level (MMCL) for several of these compounds for public drinking water supplies (MDEP 1996b).

## VIII.  APPENDIX B

Antimony and pentachlorophenol were detected at elevated levels (i.e., relative to both health-based screening values and natural background levels) in a few of the soil samples collected at the site (2 of 11 samples for antimony, 1 of 9 samples for pentachlorophenol). The single detection of pentachlorophenol and the maximum detection of antimony were in soil samples taken from known waste piles (USEPA 1996). Antimony is a metal that is principally used in the formation of alloys with lead and other metals. It is not typically used in the tanning process but is occasionally used to manufacture pigments and adhesives. People using antimony for medicinal purposes have experienced gastrointestinal effects (diarrhea, vomiting), joint and muscle pain, anemia, and heart problems (ATSDR 1992). Pentachlorophenol is a pesticide and wood preservative that has been associated with the tanning process. It can contain impurities of polychlorinated phenols, polychlorinated dibenzo-p-dioxins, and polychlorinated dibenzofurans. Animal studies have shown that the most sensitive organs to long-term exposure to pentachlorophenol are the liver, kidney, nervous system, and the immune system (ATSDR 1994).

Chromium is commonly used in the tanning process. Consequently, its presence at the site is consistent with reports that tannery waste was dumped on the site (BBOH 1996). Chromium can occur in two different forms under normal environmental conditions, hexavalent and trivalent. The toxicity of chromium is very different depending on whether the chromium is in the trivalent or hexavalent oxidation state. Hexavalent chromium is considered a known carcinogen. In contrast, trivalent chromium is not currently considered to be a carcinogen. For non-cancer effects, hexavalent chromium is considered more toxic than trivalent chromium. Based on reports from the scientific literature, the most important, non-cancer health endpoints associated with chromium exposure are gastrointestinal, kidney, and liver effects (ATSDR 1993b).

One soil sample at the site was analyzed for hexavalent chromium. In this sample, the fraction of total chromium in the hexavalent form was less than 0.005 percent and below any level for health concern (Table 1). In addition, hexavalent chromium was not detected in any of the private well samples (Table 3). Although the form of chromium could vary with location at a site, the limited information so far suggests that most of the chromium in the soil is in the less toxic trivalent form. The maximum chromium concentration was detected in a suspected waste pile. All the other samples that detected chromium were less than the RMEG for trivalent chromium.

The term "dioxin" stands for a class of 75 organic compounds called chlorinated dibenzo-p-dioxins (CDDs) that exhibit similar chemical structure. Dioxin is not intentionally created except for use as a reference standard for laboratory experiments. However, dioxin may be inadvertently produced during several industrial processes including incineration, municipal and industrial waste disposal, and manufacture of specific herbicides and germicides (ATSDR 1989). The soil at the site was tested for dioxin after pentachlorophenol, a herbicide and wood preservative which is known to

18

be associated with dioxin contamination, was detected in the soil (ATSDR 1994). The most important toxicological concern related to dioxins is carcinogenicity.

Dioxins resist degradation in the environment and are very tightly bound to soil particles. As a consequence, it is unlikely that dioxin will leach into the groundwater from soil contamination. (Arthur and Frea, 1989; Puri et al., 1989; ATSDR 1989)

Because health-based screening values and action levels have only been set for 2,3,7,8-TCDD[1], the most toxic of the dioxin compounds, a method was established by an international committee whereby the concentrations of all the different CDDs in a sample are combined into a single number, the toxicity equivalence (TEQ). This method accounts for the different toxicities of the CDD compounds relative to 2,3,7,8-TCDD. Therefore, the TEQ represents the concentration of pure 2,3,7,8-TCDD in the sample that would have the same toxicity as the concentrations of all the CDDs in the sample combined. Consequently, the TEQ of a sample can be compared with screening values established for 2,3,7,8-TCDD (Travis and Hattemer-Frey, 1991).

Dioxin compounds were detected in the one soil sample that was analyzed for these compounds. 2,3,7,8-TCDD was not detected in the sample but several of the other CDDs were detected at levels well above their expected background levels (Reed et al., 1990). As a result of these detections, the toxicity equivalence (TEQ) of the sample collected from the site was 24.7 ug/kg. The U.S. Centers for Disease Control and Prevention (CDC) has established an action level of 1 ug/kg for 2,3,7,8-TCDD at residential properties (e.g., assuming daily contact) (Kimbrough et al., 1984). ATSDR health-based screening values for 2,3,7,8-TCDD are 0.05 ug/kg and 0.7 ug/kg for adults and children, respectively. These values were also established assuming daily contact with the contaminated soil and represent levels at which further exposure evaluation is warranted, not levels above which health effects are necessarily expected.

The one soil sample that was analyzed for dioxin was collected from a suspected waste pile (the waste pile with the highest chromium concentration) (USEPA 1996, MDEP 1996a). Consequently, it is possible that the dioxin TEQ in this pile may be higher than the average TEQ for the whole site.

Lead was found in concentration greater than expected background levels (MDEP 1995). Young children (less than 5 years old) are the population of most concern for potential exposure to lead in soil because of their greater hand-to-mouth activity, higher absorption of lead in the gastrointestinal tract, and greater susceptibility to its effects (e.g., neurological effects) (ATSDR 1993c).

Copper was found above background levels in soil normally found in Massachusetts (MDEP 1995). No health-based screening value is available for copper, which is an essential nutrient. Because of its generally low toxicity, it is not one of the compounds of most concern at this site.

---

[1] 2,3,7,8-tetrachlorodibenzo-p-dioxin

19

# Tab 2



# The Commonwealth of Massachusetts
## Executive Office of Health and Human Services
### Department of Public Health
250 Washington Street, Boston, MA 02108-4619

**ARGEO PAUL CELLUCCI**
GOVERNOR

**WILLIAM D. O'LEARY**
SECRETARY

**HOWARD K. KOH, MD, MPH**
COMMISSIONER

## M E M O R A N D U M

To:         Elaine T. Krueger, Chief
            Environmental Toxicology Unit
            Bureau of Environmental Health Assessment

From:       Alexandra S. French, Senior Environmental Analyst

            Environmental Toxicology Unit
            Bureau of Environmental Health Assessment

Re:         Results of the Berkley Private Well Testing (March/April 1998)

Date:       May 22, 1998

### Background

In 1996, the U.S. Environmental Protection Agency (EPA) Region I requested that the Massachusetts Department of Public Health (MDPH) conduct a health consultation on potential public health concerns regarding the proposed Bogs Landing site in Berkley, Massachusetts. Because of concerns related to private drinking water supplies in residences directly bordering the site, MDPH requested and obtained special permission from the U.S. Agency for Toxic Substances and Disease Registry (ATSDR) to use funds from MDPH's cooperative agreement with ATSDR to conduct sampling of private wells potentially affected by groundwater flowing from the site.

In the Health Consultation (October 1996), MDPH concluded that site contaminants were not found in wells at that time. However, due to high levels of site contaminants and other site considerations MDPH recommended that the hydrogeology of the area and the distribution of chemicals in the groundwater and soils be further characterized. Similar supplementary recommendations were also made in an Addendum to the Health Consultation in July 1997 including a recommendation to the environmental regulatory agencies that, if site characterization and remediation are not able to proceed in a timely fashion, consideration should be given to further testing of the private residential wells. This recommendation, along with encouragement to proceed as quickly as possible with site remediation measures, was reiterated in a December 12, 1997 letter to EPA from MDPH.

Based on the above recommendations and on continuing concern that on-site contaminants may have migrated from the site to off-site wells, a second drinking water sampling effort was conducted as a precautionary measure in March/April 1998. This second round of testing was offered as a service by the MDPH at the request of the EPA and with approval and funding from ATSDR.

Methods
A protocol that describes in detail the scientific rationale for this sampling effort was developed in consultation with the U.S. Geological Survey and other environmental agencies. Briefly, the private wells were chosen based on the anticipated direction of groundwater flow, the depth of the well, and/or the proximity to either the site or a waterway that drains water flowing from stream or wetland areas at or near the site (see Figure 1). The types of contaminants selected for analysis were those believed to have the greatest potential (due to mobility and historical data regarding on-site concentrations) to migrate from the site to nearby residential wells. All private well water samples were analyzed for total chromium, hexavalent chromium, and lead, and some samples were analyzed for pentachlorophenol (PCP). The samples that were analyzed for PCP were collected from the houses with the greatest potential to be impacted by site-related contaminants based on their location as described above.

Results
A map of this geographic area is shown in Figure 1. The private wells that were sampled are shown in Figure 2. The results of the private well testing are summarized in Tables 1-4.

Total chromium was not detected in any of the 18 samples. Hexavalent chromium was detected in two of the samples but well below the drinking water standard for public water supplies.

Lead was detected in 11 of the 18 samples. The lead values ranged from not detected to 9.9 ug/L with a mean of 2.9 ug/L, all of which are below the Massachusetts Action Level for public water supplies of 15 ug/L.

Pentachlorophenol was not detected in any of the 9 wells that were tested for this compound. However, one sample will be repeated as a precautionary measure because the percent recovery for the surrogate compound was outside of the quality control (QC) limits.

Discussion
Lead was found in slightly greater than 50% of the well water samples that were tested, similar to the findings in the first sampling effort in Fall 1996. However, no lead concentration exceeded the Massachusetts Action Level for lead. Nine of the 18 wells that were tested in 1996 were retested in the March/April 1998 effort. The most recent lead concentrations at 7 of the 9 wells were slightly higher than in 1996; the lead level in 1 sample was the same (not detected) as in 1996; and the lead concentration in 1 sample had lower levels of lead in this round of sampling. Lead is commonly found in drinking water from both private wells and municipal water supplies, primarily due to lead leaching from sources such as pipes, solder, and fixtures. If the source of lead is from somewhere other than the plumbing, for example, one would expect higher levels of lead upgradient and closer to the source. Since lead was not detected (detection limit = 5 ug/L) in groundwater samples collected beneath the waste site by the Massachusetts Department of

2

Environmental Protection (MDEP) this Spring, it would appear that indoor water system components are the most likely contributors to the lead found in the well water.

Hexavalent chromium, one form of chromium, was detected in 2 samples in which total chromium was not detected (using the same detection limit). The laboratory (Severn, Trent, Envirotest) explained that that the discrepancy between the hexavalent chromium and total chromium results is due to the fact that the methods for analysis of hexavalent chromium and total chromium differ. Apparently, the total chromium method is a more rigorous, sophisticated method that provides a higher level of confidence than the colorimetric method used for hexavalent chromium analyses. Despite this discrepancy, all of the chromium results were either not detected or were detected at concentrations well below the drinking water standards for public water supplies. Further, there is no correlation with the presence of chromium and that of lead. If the wells were being impacted by groundwater from the site, one would expect chromium to be present in conjunction with the lead since chromium concentrations in on-site soils are greater than the lead concentrations.

Ten residents of the 28 targeted houses chose not to participate in the well testing. In our sampling protocol, we stated that if some of the residents chose not to participate, then we would target alternate wells in similar proximity. Based on the results of the sampling at the houses with the greatest potential for being impacted, along with recently released groundwater testing from the MDEP indicating that all groundwater analytes were either not detected or were below relevant regulatory standards, testing additional houses does not appear to be necessary. However, while unlikely to change the conclusions, it is possible to offer to sample wells for the analysis of metals and/or PCP at some additional houses as a service to those homeowners to replace houses that chose not to participate in the March/April 1998 effort.

Conclusion

In conclusion, the results of the most recent sampling effort indicate that the levels of total chromium, hexavalent chromium, lead, and pentachlorophenol present in the targeted wells are either not detected or well below the relevant Massachusetts drinking water standards for public water supplies. In addition, all semivolatile compounds, dioxins, and metals that were analyzed for in the groundwater upgradient from the wells (i.e., beneath the waste site) by the environmental regulatory agencies, including those compounds evaluated in the private well sampling conducted by MDPH, were not detected or were below drinking water standards for public water supplies.[1]

High levels of some contaminants have been found to be present in on-site soils, with the potential remaining to impact the groundwater, and therefore, private wells in the future (MDPH October 1996 Health Consultation and July 1997 Addendum). For this reason, MDPH continues to support the environmental regulatory agencies in their efforts to implement appropriate source reduction to prevent opportunities for exposure, including via well water consumption, to site-related contaminants in the future. Because site remediation is currently underway, and

---

[1] See summary Table 2, Analytical Data - Groundwater, from *ABB Environmental Services, Inc., Assessment Only, Immediate Response Action, Proposed Bogs Landing Site, Berkley, Massachusetts, March 1998* and per dioxin analytical results table available under separate cover

groundwater and private well testing results indicate that the site is not currently impacting private wells in the surrounding area, unless new information becomes available, additional private well testing at this time does not appear to be necessary.

DRAFT

**Table 1:** Summary of results from private well testing in Berkley, MA (March/April 1998)

| Compound | Detects/ Samples | Minimum Concentration (ug/L) | Maximum Concentration (ug/L) | MMCL (ug/L) |
|---|---|---|---|---|
| Total Chromium[a] | 0/18 | ND (5) | ND (5) | 100 |
| Hexavalent Chromium[a] | 2/18 | ND (5) | 7.9 | 100[b] |
| Lead | 11/18 | ND (1) | 9.9 | 15 |
| Pentachlorophenol | 0/9 | ND (0.3) | ND (0.3) | 1 |

**Table 2:** Summary of results from private well testing North Main Street

| Compound | Detects/ Samples | Minimum Concentration (ug/L) | Maximum Concentration (ug/L) | MMCL (ug/L) |
|---|---|---|---|---|
| Total Chromium[a] | 0/3 | ND (5) | ND (5) | 100 |
| Hexavalent Chromium[a] | 1/3 | ND (5) | 7.9 | 100[b] |
| Lead | 3/3 | 2.8 | 6.2 | 15 |
| Pentachlorophenol | 0/2 | ND (0.3) | ND (0.3) | 1 |

**Table 3:** Summary of results from private well testing on Burt Street

| Compound | Detects/ Samples | Minimum Concentration (ug/L) | Maximum Concentration (ug/L) | MMCL (ug/L) |
|---|---|---|---|---|
| Total Chromium[a] | 0/5 | ND (5) | ND (5) | 100 |
| Hexavalent Chromium[a] | 0/5 | ND (5) | ND (5) | 100[b] |
| Lead | 3/5 | ND (1) | 7.1 | 15 |
| Pentachlorophenol | 0/4 | ND (0.3) | ND (0.3) | 1 |

**Table 4:** Summary of results from private well testing on Jerome Street

| Compound | Detects/ Samples | Minimum Concentration (ug/L) | Maximum Concentration (ug/L) | MMCL (ug/L) |
|---|---|---|---|---|
| Total Chromium[a] | 0/10 | ND (5) | ND (5) | 100 |
| Hexavalent Chromium[a] | 1/10 | ND (5) | 6.0 | 100[b] |
| Lead | 5/10 | ND (1) | 9.9 | 15 |
| Pentachlorophenol | 0/3 | ND (0.3) | ND (0.3) | 1 |

MMCL - Massachusetts Maximum Contaminant Level
ND (value) - The analyte was not detected at the detection limit shown in parentheses.
a - Samples were analyzed for total chromium and hexavalent chromium using different analytical methods
b - No MMCL is available for hexavalent chromium. However, the MMCL for total chromium was derived based on the health effects of hexavalent chromium; thus, the MMCL for total chromium is applicable to both compounds.



Figure 1: Topographic map of the site area.

Source: US Geological Survey Map # 41071-G1-TM-025, "Somerset, Massachusetts", 1985



Figure 2
Location of Private Well Samples in Berkley, MA
March/April 1998

**Tab 3**



# Analytical Balance
## C O R P O R A T I O N

Environmental Chemistry
Site Assessment
Quality Assurance Services
Environmental Services
Site Sampling
Data Auditing

26 August 2002

Brant Haworth
24 Dunbar Road
Lakeville, MA   02347

COLLECTED BY:  B. Haworth
TIME:          12:30
LOCATION:      N. Main St., Berkley, MA
               (Grab)

SAMPLE DATE:    8/08/2002
DATE RECEIVED:  8/08/2002
SAMPLE ID:      G0238539

## RESULTS OF ANALYSIS

| | Parameter | Analytical Method | Date Analyzed | Units | Detection Limit | Result | |
|---|---|---|---|---|---|---|---|
| √ | Arsenic (As) | EPA 6010B | 8/13/02 | mg/kg | 0.41 | 2.8 | ok. WITHIN TOLLERANCE |
| √ | Barium (Ba) | EPA 6010B | 8/13/02 | mg/kg | 0.41 | 15.0 | o.k |
| | Cadmium (Cd) | EPA 6010B | 8/13/02 | mg/kg | 0.41 | ND | |
| √ | Total Chromium (Cr) | EPA 6010B | 8/13/02 | mg/kg | 0.41 | 7.7 | ok.? |
| √ | Lead (Pb) | EPA 6010B | 8/13/02 | mg/kg | 2.1 | 11.0 | ok.? |
| | Mercury (Hg) | EPA 7471A | 8/13/02 | mg/kg | 0.08 | ND | |
| | Selenium (Se) | EPA 6010B | 8/13/02 | mg/kg | 0.82 | ND | |
| | Silver (Ag) | EPA 6010B | 8/13/02 | mg/kg | 0.41 | ND | |

ND = Not Detected
EPA SW846
Analysis was done by a sub-contract lab (M-MA-086).

Laboratory Manager / Date   8/26/02

$$1 \ mg/Kg = \frac{1000^{mg}/Kg}{1 \ mg \ KG}$$

Sample Number   G0238539

page 2

| Compound | Result (µg/kg) | Detection Limit (µg/kg) | Analytical Method | Date Analyzed |
|---|---|---|---|---|
| Ethylbenzene | ND | 1.3 | EPA 8260B | 8/15/02 |
| Chloromethane | ND | 6.5 | EPA 8260B | 8/15/02 |
| Bromomethane | ND | 2.6 | EPA 8260B | 8/15/02 |
| Vinyl Chloride | ND | 2.6 | EPA 8260B | 8/15/02 |
| Chloroethane | ND | 2.6 | EPA 8260B | 8/15/02 |
| 1,1-Dichloroethene | ND | 1.3 | EPA 8260B | 8/15/02 |
| trans-1,2-Dichloroethene | ND | 2.0 | EPA 8260B | 8/15/02 |
| Trichloroethene | ND | 1.3 | EPA 8260B | 8/15/02 |
| 1,2-Dichlorobenzene | ND | 6.5 | EPA 8260B | 8/15/02 |
| 1,3-Dichlorobenzene | ND | 6.5 | EPA 8260B | 8/15/02 |
| 1,4-Dichlorobenzene | ND | 6.5 | EPA 8260B | 8/15/02 |
| Methyl tert butyl ether | 330 | 2.6 | EPA 8260B | 8/15/02 |
| p/m-Xylene | ND | 1.3 | EPA 8260B | 8/15/02 |
| o-Xylene | ND | 1.3 | EPA 8260B | 8/15/02 |
| cis-1,2-Dichloroethene | ND | 1.3 | EPA 8260B | 8/15/02 |
| Dibromomethane | ND | 13 | EPA 8260B | 8/15/02 |
| 1,4-Dichlorobutane | ND | 13 | EPA 8260B | 8/15/02 |
| Iodomethane | ND | 13 | EPA 8260B | 8/15/02 |
| 1,2,3-Trichloropropane | ND | 13 | EPA 8260B | 8/15/02 |
| Styrene | ND | 1.3 | EPA 8260B | 8/15/02 |
| Dichlorodifluoromethane | ND | 13 | EPA 8260B | 8/15/02 |
| Acetone | 77 | 13 | EPA 8260B | 8/15/02 |
| Carbon Disulfide | ND | 13 | EPA 8260B | 8/15/02 |
| 2-Butanone | ND | 13 | EPA 8260B | 8/15/02 |
| Vinyl Acetate | ND | 13 | EPA 8260B | 8/15/02 |
| 4-Methyl-2-pentanone | ND | 13 | EPA 8260B | 8/15/02 |
| 2-Hexanone | ND | 13 | EPA 8260B | 8/15/02 |
| Ethyl methacrylate | ND | 13 | EPA 8260B | 8/15/02 |
| Acrolein | ND | 32 | EPA 8260B | 8/15/02 |

*Analytical Balance Corp.*
422 West Grove St., Middleboro, MA 02346  508-946-2225; 508-946-3335 (f)

# EXHIBIT "C"

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3    _____

 4    ALAN DREYFUS,                    )
            Plaintiff                  )
 5                                     )
      vs.                              )      Civil Action
 6                                     )      No. 04-10876WGY
      TOWN OF BERKLEY, ET AL,          )
 7          Defendants                 )

 8    _____
```

 9          Deposition of ALAN DREYFUS, a witness called on

10    behalf of the Defendants, pursuant to the provisions of

11    the Massachusetts Rules of Civil Procedure, before Nancy

12    Atherton, a Certified Shorthand Reporter and Notary Public

13    in and for the Commonwealth of Massachusetts, at Pierce,

14    Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA

15    02110-1257, commencing at 10:00 A.M., Wednesday,

16    January 11, 2006.

17

18

19

20

21

22

23

24
                    NANCY J. ATHERTON, CSR
25                       35 Laura Lane
                      Norton, MA 02766
                       (508) 223-1125

| | | |
|---|---|---|
| 1 | | anything in regard to the DEP cleanup? |
| 2 | A | No. |
| 3 | Q | How long did you talk to Mr. Mattoza? |
| 4 | A | Probably 15, 20 minutes at a couple different times. |
| 5 | Q | I'm just referring to this first occasion. |
| 6 | A | Probably about 15 or 20 minutes. |
| 7 | Q | So other than him telling you about the prior use of |
| 8 | | the property as a type of farmland and the presence |
| 9 | | of the hazardous waste site adjacent to the |
| 10 | | property, did you talk to him about anything else? |
| 11 | A | I don't believe so. |
| 12 | Q | Did he refer to the hazardous waste site as Bogs |
| 13 | | Landing? |
| 14 | A | Yes. |
| 15 | Q | Had you ever heard of that before? |
| 16 | A | No. |
| 17 | | MR. SANKEY:  I'm going to grab a different color |
| 18 | | pen. |
| 19 | | (Short break taken.) |
| 20 | Q | On the rear side of Exhibit 1 showing the assessor's |
| 21 | | plan, does that show the site that you understood to |
| 22 | | be Bogs Landing? |
| 23 | A | No. |
| 24 | Q | Does it show the Haul Road?  Does that show the area |
| 25 | | of the Haul Road that goes to Bogs Landing? |

1    A    The New Haul Road or the original Haul Road?

2    Q    The original Haul Road.

3    A    No, it doesn't.

4    Q    Does it show the New Haul Road?

5    A    No, it doesn't.

6    Q    Where is the -- to the best you can, maybe if it's

7         not in here, show me in the area where the Bogs

8         Landing site would be.  Actually, use this.

9    A    And would you like me to put in the Old Haul Road or

10        the New Haul Road?

11   Q    When we are referring to the Old Haul Road, make

12        sure we are using the same term, that would be the

13        Haul Road that would have been used in the 1930's or

14        40's or whenever they were using it to transport

15        tannery waste back from the area of North Main

16        Street back to the Bogs Landing site, is that

17        correct?

18   A    Correct.

19   Q    Show me where the Old Haul Road would be.

20   A    (Witness complying).  And we've run out of paper to

21        put the actual site in.

22   Q    Okay.  So just for the purposes of the record,

23        you've drawn with the orange marker a relatively

24        parallel line and that indicates the Old Haul Road?

25   A    Correct.

1   Q   Now, when you refer to a New Haul Road, what does

2        that refer to?

3   A   That would be the road that DEP and the EPA created

4        to haul things in and out of the site because

5        there's a person residing with a house on this piece

6        of property.

7   Q   Right along North Main Street?

8   A   Right here.

9   Q   Okay.

10  A   And a business.  And there's also a pond right there

11       and a shop right there that would stop anyone from

12       being able to use that road.

13  Q   Without drawing, in general, where is the New Haul

14       Road?  You don't have to draw it on there.  Just

15       show me.

16  A   It goes approximately back here.  And it utilizes it

17       old part right here, but it swings out this way and

18       comes in from another area over here on North Main

19       Street.

20  Q   So away from -- the New Haul Road is away from your

21       property?

22  A   Yes.

23  Q   But as I see the way that you've drawn it, the Old

24       Haul Road where they transported the tannery waste

25       runs essentially along the property line, up the

1       rear portion of your property, is that correct?

2  A   Yes, along the --

3       MR. COREY:  Would it be north?  Do we have a --

4       maybe that would make it easier if we could just use

5       north, south, east and west.

6       MR. SANKEY:  I'm just going by the -- if I go

7       north, south I just get confused.  That's why I'm

8       just trying to go with the drawing.

9  A   That would actually be east.

10  Q   Okay.  So it runs along the north edge of your

11      property as you've drawn it on the second page of

12      Exhibit No. 1, correct?

13  A   Yes.

14  Q   Did Mr. Mattoza tell you at that time anything about

15      the Haul Road?

16  A   No.

17  Q   Did he tell you that the tannery waste had been --

18      did he tell you what the source of the contamination

19      was for the Bogs Landing site?

20  A   Mr. Mattoza suggested that if I needed to have any

21      further information about anything that went on out

22      there, that the best thing for me to do would be go

23      over to Lakeville and talk to DEP about it.

24  Q   Okay.  So does that fairly exhaust your memory of

25      your initial conversation with Mr. Mattoza?

```
 1   A   Yes.

 2   Q   So then I take it, just trying to stay

 3       chronologically, which is the best way that I think,

 4       you got an assessor's map; you went out to the

 5       property that day and you walked around?

 6   A   Yes.

 7   Q   What did you do next in regard to consideration of

 8       purchasing the property?

 9   A   I contacted a woman at DEP named Julie Hutchinson.

10   Q   Do you recall when that was?

11   A   Probably within a day or two after talking to George

12       Mattoza.

13   Q   Did you do it by telephone call?

14   A   Yes.

15   Q   Does she work out of the Boston office?

16   A   No, Lakeville.

17   Q   I'm sorry.  You just told me that.  And tell me

18       about your conversation with her.

19   A   I asked her -- I explained to her that I was

20       interested in purchasing a farm field that was

21       adjacent to the property.

22   Q   Adjacent to what property?

23   A   To the Bogs Landing property.

24   Q   Can I stop you there for just one second?

25   A   Sure.
```

1    Q    You indicated that the Bogs Landing is essentially

2         off the assessor's map.  How large is the Bogs

3         Landing site, if you know?

4    A    I'm going to say probably and eighth of a mile in

5         diameter.

6    Q    And how far in distance is it from the eastern edge

7         of your property?

8    A    Approximately a quarter mile back into the woods.

9    Q    So this Haul Road is about a quarter of a mile long,

10        is that correct?

11   A    From the corner of my property back to the site?

12   Q    Right.

13   A    Yes.  And I'll add another thing to that.  There's

14        also a large --

15   Q    Don't draw it in yellow.  Go ahead; do it in pen.

16   A    Okay.  Approximately right in this section here is

17        about a 10-foot drop in elevation and wetlands that

18        go pretty much both directions.  And this Haul Road

19        is approximately 5 feet below the lowest part of the

20        grade of my property, if you follow what I'm saying.

21             If you were to drive on this Old Haul Road, if

22        you were able to, you would actually be looking at a

23        bank on the property line.  So everything is well

24        below my grade, this whole entire Bogs Landing, Haul

25        Road and everything else.

1   Q   All right.  And that would be north of -- that would

2       be the plot north of your front lot?

3   A   Driveway, yes.

4   Q   So there's one house there?

5   A   Yes, and it's close to the street.

6   Q   Is there another house on the plot north of that

7       one?

8   A   Yes, brand-new.

9   Q   Okay.  And that's what you referred to earlier?

10  A   Yes.

11  Q   All right.  When I interrupted you, you were talking

12      to me about your meeting or your conversation with

13      Julie Hutchinson at DEP, correct?

14  A   Yes.

15  Q   Okay.  What do you recall about that discussion?

16  A   Well, I pretty much wanted to know everything there

17      was about what was going on as far as this piece of

18      property and that piece of property.  And she

19      assured me that there were --

20  Q   This piece of property you are referring to the one

21      you were interested in buying?

22  A   Yes.

23  Q   And that piece of property you're referring to the

24      Bogs Landing site?

25  A   Correct.

1   Q   Okay.

2   A   She assured me up and down two sides there was

3       absolutely no issues with the piece of property that

4       I was considering purchasing and that a thorough

5       cleanup had been done and she was the supervisor of

6       that site.

7   Q   Anything else?

8   A   And basically she told me what had been dumped out

9       there and that I had no issues because of the water

10      all migrated towards the east so there would be no

11      problem that way; that there was wetlands in between

12      my piece of property and the actual contamination

13      site so that there would never be any issues that

14      way; that it was clearly two pieces of -- two

15      separate pieces of property.  And, again, she had

16      assured me that the property that I was purchasing

17      was a clean piece of property.

18  Q   You said she told you what had been dumped.  What

19      did she tell you?

20  A   Tannery waste.

21  Q   And did she mention the location of the Haul Road

22      that was running adjacent to your property?

23  A   Yes.

24  Q   Do you recall any specific conversations about what

25      she said about the Haul Road?

1   A   No.

2   Q   Was it part of the conversation since that was the

3       closest portion to your property?

4   A   We really didn't get into anything over that.

5   Q   How long was your conversation with her?

6   A   Approximately 45 minutes.

7   Q   And you said this was all by telephone?

8   A   Yes.

9   Q   Did she provide you with any documents?

10  A   No, she didn't.

11  Q   Did she refer you to any other documents for you to

12      look at?

13  A   Yes, she referred me to the board of health in

14      Berkley.

15  Q   What did she say about that?

16  A   She told me outside of what she was able to tell me

17      that I ought to just for my best interest go to the

18      board of health and see if they had any

19      documentation of any further cleanup or anything in

20      question as far as the lot I was interested in

21      buying.

22  Q   So is it your understanding based upon that that the

23      board of health might have additional information

24      beyond what Julie Hutchinson had told you?

25  A   She suggested that I check with the town as well.

1   Q   What was your understanding that the board of

2       health's role had been, if any, in the cleanup at

3       Bogs Landing?

4   A   She had told me that there was a couple of members

5       of the board down there from time to time while the

6       cleanup was going on.  Again, I was only concerned

7       with the piece of property that I was purchasing,

8       not with Bogs Landing because of what she had told

9       me, that it was all cleaned up.  It wasn't like it

10      was an ongoing site or something that it was a

11      concern.  As of right now I was interested in

12      buying, you know, the other lot, not Bogs Landing.

13  Q   Did you have any concern at all about purchasing a

14      plot of land that you were going to build a house on

15      that was within a quarter of mile of a DEP cleanup

16      site?

17  A   Not at all.

18  Q   All right.  So after you spoke with -- is there

19      anything else you can recall about your conversation

20      with Julie Hutchinson?

21  A   No.

22  Q   What did you do next?

23  A   I went back to the town hall within another day or

24      two of talking with her and spoke with the secretary

25      to the board of health.  Her name of was Joyce.

| | | |
|---|---|---|
| 1 | Q | Were you by yourself? |
| 2 | A | Yes. |
| 3 | Q | Did you have a conversation with her about the |
| 4 | | property? |
| 5 | A | Yes. |
| 6 | Q | Tell me about that. |
| 7 | A | She also told me the same thing that George Mattoza |
| 8 | | told me; that it was a farm field; that it grew |
| 9 | | crops, vegetables and basically sold to people at |
| 10 | | the roadside stand.  And, you know, I wasn't really |
| 11 | | all that interested in Mr. Hinman's problems because |
| 12 | | I wasn't buying it from him anyways. |
| 13 | Q | Did she discuss with you the problems that he had |
| 14 | | with you, the financial problems? |
| 15 | A | Right.  It's a small town.  Everybody is into |
| 16 | | everybody else's business anyway.  But I didn't want |
| 17 | | to hear about Mr. Hinman's problems. |
| 18 | Q | In general, what were the problems that you were |
| 19 | | told? |
| 20 | A | Well, he just got into problems with paying his |
| 21 | | bills and got into bankruptcy and got divorced.  And |
| 22 | | after you hear it from a half a dozen people, you're |
| 23 | | all done hearing it. |
| 24 | Q | Small town, right? |
| 25 | A | Mm-hmm. |

1    Q    Even smaller than Mansfield.

2    A    Yeah.

3    Q    What else did Joyce tell you?

4    A    I asked her if she could give me any information as

5         far as any history of the property as far as if the

6         board of health had any issues with that property.

7         And she checked under the assessor's map numbers,

8         which are on that piece of paper, as far as the lot

9         numbers and the assessor's map numbers and under

10        Donald Hinman's name and a gentleman that owned it

11        before him who's deceased, I think his name was

12        Bumpus who was the original farmer of both sides of

13        the road way back when; and the board of health had

14        no files, folders issues or anything else for me to

15        review.  She said there's no issues on this piece of

16        property.

17   Q    How long had Hinman owned it, if you know?

18   A    I don't know.

19   Q    Do you know if anyone else had attempted or made

20        inquiries about purchasing the property before you

21        did?

22   A    I believe Steven Shamban said there was somebody

23        else that was thinking about purchasing it, somebody

24        in Berkley and didn't happen.

25   Q    Do you know who it was?

| | | |
|---|---|---|
| 1 | | MR. COREY:  Yeah, it does. |
| 2 | Q | The area that you outlined in the orange that I've |
| 3 | | written the word Flint, you think that's his |
| 4 | | property? |
| 5 | A | I know that's his property. |
| 6 | Q | Okay.  So what was your conversation that you had |
| 7 | | with Mr. Flint? |
| 8 | A | He told me that basically he was going to purchase |
| 9 | | the property at one time and then never really got |
| 10 | | into why he didn't purchase it and then told me he |
| 11 | | didn't know why the board of health was putting me |
| 12 | | through what they were putting me through.  That was |
| 13 | | basically it. |
| 14 | Q | Is he a longtime Berkley resident? |
| 15 | A | Yes. |
| 16 | Q | Did he offer any rumors, guesses, conjectures as to |
| 17 | | why you were having problems with the board of |
| 18 | | health? |
| 19 | A | I don't know if I really want to get into all the |
| 20 | | rumors and gestures and everything that has gone on |
| 21 | | the whole time I've been there because it's -- |
| 22 | Q | Well, I'm asking you to the extent that it was |
| 23 | | conveyed to you specifically by Mr. Flint.  Did he |
| 24 | | tell you anything? |
| 25 | A | He did tell me things; but I can't, you know -- I |

```
 1         don't know how true any of them are.

 2    Q    Okay.  Whether they are true or not, I'm just asking

 3         what he told you.

 4              MR. COREY:  Please answer.

 5    A    Okay.  He told me part of the problem was the

 6         gentleman I hired to do some of my site work down at

 7         the property there who lives two more doors down.

 8    Q    Okay.  What was the problem because you hired him?

 9         First of all, what's his name?

10    A    Alfred Gouveia.

11    Q    G-O-V-E-I-A?

12    A    Something on that idea.

13              MR. COREY:  G-O-U-V-E-I-A.

14    Q    I knew there was a U missing somewhere.  You hired

15         him to do the site work?

16    A    Yes.

17    Q    When did you hire him?

18    A    Approximately the time that the perc tests were

19         started.

20    Q    Okay.  We'll come back to that because, as I said,

21         I'm going to try to stay chronologically, but at

22         some point.  So he told you there was a problem

23         because you hired Mr. Gouveia.  What was the problem

24         that he told you?

25    A    He was a selectman at the time, which I didn't know.
```

1  Q    Gouveia was?

2  A    Yes.  And he also witnessed and turned in the board

3       of health to the board of ethics, so the board of

4       health had a vendetta against him.

5  Q    Did that have anything to do with your property?

6       When he said that he witnessed something and turned

7       them into the board of ethics, I take it that was

8       involving a different piece of property than yours?

9  A    Yes.

10  Q   Anything else?

11  A   That's pretty much it.

12  Q   Did you ever come -- I think you prefaced your

13      remarks and not even wanting to talk about it,

14      saying you didn't know if they were true, have you

15      ever been able to validate whether anything he told

16      you was true or not?

17  A   I read an article in one of the newspapers.  I think

18      it was either the Taunton Gazette or the Brockton

19      Enterprise there that the board of health was before

20      the board of ethics.  And I knew that was true.  And

21      then later talking to Mr. Gouveia about that whole

22      situation, he was the one that turned them in.

23  Q   Mr. Gouveia turned in the board of health?

24  A   Yes.

25  Q   Did Mr. Gouveia indicate to you that he thought that

1       stuck on the side of a stick by the foundation of

2       the house.

3   Q   Do you know who wrote that?

4   A   No, I don't.

5   Q   Did you ever have anybody investigate to try to

6       determine who wrote it?

7   A   No.

8   Q   So as you sit here today, you don't have any fact to

9       attribute that to James Romano or the board of

10      health?

11  A   I can't prove who wrote it.

12  Q   All right.  Let me jump back to chronologically we

13      are still at the point where you are considering

14      buying the house.  And I've got you back at the town

15      hall.  You've spoken to Joyce, the board of health

16      secretary.  Is there anything else that you remember

17      about the conversation with her?  I think you left

18      off telling me she checked the map numbers and that

19      there were no files.

20  A   Right, she checked every file and folder that was

21      under any name, assessor's map, street address; and

22      there were absolutely no issues that the board had

23      with that piece of property, which basically backed

24      up what Julie had told me at DEP.

25  Q   Anything else you recall from your conversation with

1       her?

2    A  No.

3    Q  How long did you speak with her?

4    A  Approximately an hour.

5    Q  Did you look at any documents while you were there?

6    A  There was nothing to look at.  She couldn't pull a

7       single thing.

8    Q  Did she tell you anything more about the Bogs

9       Landing site?

10   A  No.

11   Q  Anything more about the cleanup?

12   A  No.  She told me -- she referred me back to Julie if

13      I needed to know anything about that.

14   Q  Okay.  What did you do next?

15   A  I called Mr. Parham up and signed the purchase and

16      sales on the piece of property.

17   Q  Now, in response to my request for production of

18      documents I know I requested a copy of the purchase

19      and sale and other documents related to the closing,

20      but I didn't get them.  Do you have a copy of the

21      purchase and sale?

22         MR. COREY:  For the record, we didn't have one.

23      I had asked Mr. Dreyfus for it, but he hasn't been

24      able to locate it in any of his records including

25      any of the closing documents.

```
 1   A   No, I hadn't.

 2   Q   Okay.  So at the time that you had purchased the

 3       property, I take it you had never met James Romano?

 4   A   No.

 5   Q   At the time that you offered to purchase the

 6       property, you hadn't met any of the members of the

 7       board of health other than the secretary?

 8   A   Correct.

 9   Q   Had you had any conservations with any other town

10       officials prior to the time that you put the offer

11       in to purchase the property?

12   A   No.

13   Q   All right.  So you put the offer in and it was

14       accepted.  You executed the purchase and sale,

15       correct?

16   A   Correct.

17   Q   What happened next?

18   A   There was a month waiting period approximately while

19       it did its process in the federal bankruptcy court.

20   Q   All right.  So you submitted the -- do you remember

21       when you signed the purchase and sale?

22   A   It would be approximately 30 days or 35 days prior

23       to the date because we did everything we could to

24       speed that process up.  So I'm going to say

25       approximately a month to maybe at the most a month
```

56

1       and a half prior to that.

2  Q   So the deed indicates it was signed on April 18 of

3       2003.  So do you think you signed the purchase and

4       sale sometime in March?

5  A   Yes.

6  Q   Then you went to closing on April 18, correct?

7  A   Yes.

8  Q   Okay.  After closing on the property, what did you

9       do next?

10  A   I went down to the property with a farm tractor with

11       a 6-foot mower on the back of it and I mowed the

12       entire piece of property.

13  Q   Why did you do that?

14  A   So I could see what it looked like.

15  Q   At that point you already owned it, right?

16  A   Yes.

17  Q   Did you do you that on your own?

18  A   Yes.

19  Q   Did you rent the tractor?

20  A   No.

21  Q   Something you have?

22  A   I bought it.

23  Q   Did you make any observations after you cleared the

24       property, anything other than what you expected?

25  A   A lot of mud.

57

1  Q    So it was wetter than you thought it was going to
2       be?
3  A    Well, it was right when everything was starting to
4       melt, and of course of grass was 12-foot tall so I
5       didn't know what I was mowing while I was mowing it
6       until I found it.
7  Q    What was your intention for the property when you
8       bought it?
9  A    To build a home and also build a barn and have some
10      horses and possibly some other livestock on the
11      property.
12 Q    Had you already decided at the time that you put the
13      offer in where you were going to site the house on
14      the property?
15 A    Pretty much once it was all mowed it was fairly
16      evident that where the house sits now is the highest
17      point on the property so that I would avoid ever
18      having water in the basement.
19 Q    Did you know at the time that you purchased it that
20      you were going to -- well, my understanding is you
21      built -- you put up a log home, correct?
22 A    Yes.
23 Q    Does that come preconstructed?  Is that the right
24      term?
25 A    It comes in kit form all numbered and lettered and

```
 1        wrapped up in skids.

 2    Q   Was that your intention, to put up a log home at the

 3        time that you entered into the purchase and sale?

 4    A   Yes.

 5    Q   Did you hire any architects to prepare any plans for

 6        the home?

 7    A   That was part of the log home package.  They do all

 8        the architectural work and everything as far as the

 9        house and everything goes.

10    Q   Did you hire any engineers or other professionals in

11        regard to the siting of the house?

12    A   Yes.

13    Q   Who did you hire?

14    A   Byron Holmes.

15    Q   Who is he?

16    A   He owns a company by the name of Holmes Engineering.

17    Q   Is it H-O-M-E-S?

18    A   H-O-L-M-E-S.

19    Q   Normally that's how I would have spelled it.  But I

20        thought I saw something in the record that it was

21        spelled H-O-M-E-S.  But you think it's the

22        traditional H-O-L-M-E-S?

23    A   Yes.  And he lives on Berkley Street in Berkley.

24    Q   Okay.  When did you hire him?

25    A   I'm going to say approximately around the time that
```

1        I purchased -- that I owned the property, after I

2        once owned it.

3  Q   So after the closing?

4  A   Yes.

5  Q   After you mowed it?

6  A   Yes.

7  Q   Okay.  And what did Mr. Holmes do?

8  A   He went to the board of health with the application

9        for doing the percolation test on the front lot and

10       on the rear lot.

11  Q   Did he do the tests before he went to the board of

12       health?

13  A   No.

14  Q   What's the sequence?  Educate me.

15  A   The sequence is he fills out an application and goes

16       to the board of health and he --

17  Q   And that's an application for what?

18  A   Percolation test or a perc test as they call it.

19       And he meets with a representative from the board of

20       health to witness the tests.

21  Q   Okay.

22  A   And then they -- that's how the whole site gets

23       started as far as elevations of septic systems and

24       that type of thing.

25           (Deposition Exhibit No. 3 marked.)

60

| | | |
|---|---|---|
| 1 | Q | I'm going to hand you what we've marked as Exhibit |
| 2 | | No. 3.  Have you seen that before? |
| 3 | A | Mm-hmm. |
| 4 | Q | And is this actually the application for the perc |
| 5 | | test? |
| 6 | A | Yes, it is. |
| 7 | Q | This indicates -- there's a typed date at the |
| 8 | | bottom.  I don't have a -- my form doesn't have the |
| 9 | | signature, but it says February 12 of 2003. |
| 10 | A | Yes. |
| 11 | Q | Now, using that date, it would appear based on what |
| 12 | | we just talked about you thought that you signed the |
| 13 | | purchase and sale in March, this looks like it would |
| 14 | | have been at least a month prior to the purchase and |
| 15 | | sale, is that correct? |
| 16 | A | Right, that's exactly correct. |
| 17 | Q | Okay.  Does that refresh your memory in regard to |
| 18 | | when any of this was done? |
| 19 | A | Well, it refreshes my memory to the point where I |
| 20 | | remember finding out that the Town of Berkley only |
| 21 | | does perc tests certain times of the year. |
| 22 | Q | Okay. |
| 23 | A | And that's the reason why at the top of the page it |
| 24 | | says property owner Donald and Donna Hinman under |
| 25 | | agreement to Alan Dreyfus. |

| | | |
|---|---|---|
| 1 | Q | So do you think the property must have been under |
| 2 | | agreement; in other words, the purchase and sale had |
| 3 | | been executed back in February? |
| 4 | A | Yes.  I think there might have been a little more of |
| 5 | | a delay as far as the -- while it was under purchase |
| 6 | | and sales while it went through its process at the |
| 7 | | bankruptcy court. |
| 8 | Q | Who filled out this application? |
| 9 | A | That would be Mr. Holmes. |
| 10 | Q | And it indicates that the person that was going to |
| 11 | | perform the test was Gerald Bernard.  Who is he? |
| 12 | A | He's someone that works for the state that the board |
| 13 | | of health hires to go out and do evaluations. |
| 14 | | MR. COREY:  Can we go off the record? |
| 15 | | MR. SANKEY:  Yeah. |
| 16 | | (Discussion off the record.) |
| 17 | | (Short break taken.) |
| 18 | Q | Do you know who Gerald Bernard is? |
| 19 | A | Yes. |
| 20 | Q | Who is he? |
| 21 | A | He's an outside inspector that does work for the |
| 22 | | town. |
| 23 | Q | Hired by the town to do the perc test? |
| 24 | A | Yes. |
| 25 | Q | Were you present when the perc test was done? |

```
1    A    Yes.

2    Q    And was Mr. Holmes present when the perc test was

3         done?

4    A    No.

5    Q    Who was there?

6    A    Alfred Gouveia who dug the holes and Gerry Bernard

7         who witnessed the perc test and myself.

8    Q    Did you eventually get the results from the perc

9         test?

10   A    I don't believe so.  I believe that Mr. Holmes got

11        all the criteria.

12   Q    Did he ever tell you what the results were?

13   A    I'm sure he did, but I just don't -- I'm not a soil

14        evaluator so they wouldn't mean anything to me.

15   Q    Well, did he tell you that there were any problems?

16   A    He told me he'd have to design a septic system based

17        on the perc evaluations and, you know, draw up

18        septic systems and elevations and everything, but he

19        says it wouldn't be a problem.

20   Q    So as a result of the perc test though you had no

21        concerns?

22   A    Correct.

23   Q    Okay.  We know now that that was done in February.

24        Eventually you go to closing.  What happens after

25        the perc test?
```

```
 1   A    I believe, and this is to the best of my belief,

 2        that the next thing was Mr. Holmes went to the board

 3        of health with a septic design based on the perc

 4        test.  And Mr. Romano said to Mr. Holmes that that

 5        guy needs a 21-E test done on that property.

 6   Q    Who told you that?

 7   A    Mr. Holmes.

 8   Q    Do you recall when it was that he had this

 9        conversation?

10   A    No.

11   Q    But he told you the conversation was with Jim

12        Romano?

13   A    Yes.

14   Q    Prior to Mr. Holmes telling you about that

15        conversation, had you ever heard of Jim Romano

16        before?

17   A    No.

18   Q    Ever dealt with him before?

19   A    No.

20   Q    So it's the first time his name comes into this

21        case?

22   A    Yes.

23   Q    Did you have an understanding of what a 21-E test

24        was?

25   A    I had heard of one.  I didn't know all the ins and
```

1    Q    Did they allow the variance?

2    A    Yes.

3    Q    You didn't have any problems with it?

4    A    Not at all.

5    Q    And again for point of reference, this was May 14 of

6         2003, does that seem right?

7    A    Yes.

8              MR. SANKEY:  I won't bother to mark it unless

9         you want me to.

10             MR. COREY:  No.  But if he we could have a copy,

11        that would be great.  Thank you.

12                  (Deposition Exhibit No. 4 marked.)

13   Q    I'm going to hand you Exhibit No. 4.  Do you

14        recognize that?

15   A    Yes.

16   Q    What's that, sir?

17   A    That is a permit to be able to put in a foundation

18        but not a full building permit.

19   Q    Is this the first permit that you received from the

20        town?

21   A    Yes.  Well, besides the perc test.

22   Q    Okay.  So the perc test and then this after that?

23   A    Yes.

24   Q    After that they gave you a permit to put in the

25        foundation?

1  A   Yes, at my own risk.

2  Q   What did you understand that to mean, at your own

3      risk?

4  A   Because the building inspector could not guarantee

5      me at that time that I would be able to get my full

6      building permit.

7  Q   What did you still have left to obtain at that

8      point?

9  A   An approval of my septic design, which the board of

10     health had.  And I guess we got a little ahead of

11     ourselves again because Jim Romano would not

12     allow -- issue the well driller permit to put the

13     well in to see if I would have potable water on the

14     property.

15 Q   When did that happen?

16 A   That actually happened before the perc test I

17     believe, not the perc test, but the septic.

18 Q   All right.

19                (Deposition Exhibit No. 5 marked.)

20 Q   Exhibit 5, do you recognize that?

21 A   Yes.

22 Q   What's that, sir?

23 A   That's the permit to construct a well.

24 Q   And when did you apply for that?

25 A   I never applied for it.  This was applied for by

```
 1        Jeff Rose who owns Hadrose Well.

 2    Q   R-O-S-E?

 3    A   Yes.

 4    Q   And did you hire him?

 5    A   Yes.

 6    Q   And you hired him to do what?

 7    A   To put a well in and pump the water and test it.

 8    Q   Do you recall when he applied for the well permit?

 9    A   Months before the date on this.

10    Q   The date on this is what?

11    A   7/8 of '03.

12    Q   And that's the date that the permit was granted?

13    A   Finally granted.

14    Q   Okay.  When you hired Mr. Rose months before, tell

15        me about your understanding about what transpired to

16        get the well permit.

17    A   Well, being that the board of health only meets

18        every other week, Mr. Rose goes in on I believe it's

19        Tuesday or Wednesday nights there at the board of

20        health meetings there and gets all his well

21        construction permits.

22            And every week he went in there to get mine,

23        Romano told him that until I had a 21-E done on the

24        property, that he wouldn't issue him the permit.

25    Q   When were you first told that you had to have a
```

1        with regard to the septic permit?

2   A   At some point in time I attended my first board of

3        health meeting with Mr. Holmes to try and get our

4        way through this. And he basically told Mr. Holmes

5        and myself that I had to have the 21-E test done on

6        the property.

7   Q   This was at a public meeting?

8   A   Yes.

9   Q   All the board members there?

10   A   Yes.

11   Q   Okay.

12             (Deposition Exhibit No. 6 marked.)

13   Q   I'm going to hand you a copy of the complaint that I

14        understand was filed in this case. And I just want

15        to catch up to make sure that I've covered all the

16        areas that relate to your dealings prior to meeting

17        with the board.

18          You see on the second page, Paragraph 10 of your

19        complaint indicates that you had contracted with

20        professionals experienced in their field to review,

21        prepare and examine the site?

22   A   Yes.

23   Q   You've seen the complaint before, correct?

24   A   Yes.

25   Q   Now, in the course of your testimony this morning

| | | |
|---|---|---|
| 1 | A | It would be prior to all the permits. |
| 2 | Q | Did you already -- |
| 3 | A | It would be shortly after the percolation test. |
| 4 | Q | Did you have your permit to construct the house |
| 5 | | foundation at that point? |
| 6 | A | No. |
| 7 | Q | All right.  Tell me what you recall about that |
| 8 | | meeting. |
| 9 | A | Mr. Romano refused to give us any of the criteria we |
| 10 | | needed to complete the building permit until I did a |
| 11 | | 21-E test on the property. |
| 12 | Q | Well, you went to this board meeting, correct? |
| 13 | A | Yes. |
| 14 | Q | Public meeting? |
| 15 | A | Yes. |
| 16 | Q | And you were there with -- |
| 17 | A | Mr. Holmes. |
| 18 | Q | -- Mr. Holmes.  The full board was in session? |
| 19 | A | Yes. |
| 20 | Q | I take you it you were an agenda item on their |
| 21 | | meeting? |
| 22 | A | Yes. |
| 23 | Q | Who said what?  How did it begin? |
| 24 | A | Mr. Holmes asked the board why I needed a 21-E test |
| 25 | | done on the property when the property was used as a |

1    farm field and so on and so forth.  And Mr. Holmes

2    asked him for some documentation substantiating the

3    need for the 21-E test.  And he says there is no

4    documentation.  I just think it's a good idea.

5    Q    Did anybody else say anything?

6    A    Mr. Holmes disagreed with him, but.

7    Q    Did Mr. Romano say why he thought it was a good

8    idea?

9    A    No.

10   Q    Was any discussion of the proximity of your property

11   to Bogs Landing made?

12   A    Not at that time.

13   Q    So at that time, whenever this first meeting was,

14   there had never been any discussion from anyone on

15   the board of health concerning their concern about

16   the proximity to Bogs Landing?

17   A    No.

18       MR. COREY:   Objection as to form.

19   A    Not at all.

20       MR. COREY:   You can answer.

21   Q    I think he did.  Did you say not at all?

22   A    Not at all.

23   Q    When he said it was just a good idea, did anyone ask

24   him why?

25   A    Mr. Holmes had some discussion with him.  And

|    |   |                                                               |
|----|---|---------------------------------------------------------------|
| 1  |   | Mr. Home is a longtime resident of the town and saw           |
| 2  |   | absolutely no need for it.  It was also explained             |
| 3  |   | that there were three or four other homes going in            |
| 4  |   | on vacant farm fields as the same as mine.                    |
| 5  | Q | Were they as close to the Bogs Landing site as                |
| 6  |   | yours?                                                         |
| 7  | A | No.                                                           |
| 8  | Q | Were they adjacent to the Haul Road, to the Old Haul          |
| 9  |   | Road as is yours?                                             |
| 10 | A | No.                                                           |
| 11 | Q | So in response to Mr. Holmes' question, did                   |
| 12 |   | Mr. Romano provide any -- did he say anything about           |
| 13 |   | why he thought it was a good idea?                            |
| 14 | A | No.                                                           |
| 15 | Q | So the only -- what else do you recall Mr. Romano             |
| 16 |   | saying during this entire meeting?                            |
| 17 | A | That I would need a 21-E test before he would issue           |
| 18 |   | me a well permit or a septic design approval.                 |
| 19 | Q | And you also indicated that he said that there was            |
| 20 |   | no documentation but it was just a good idea?                 |
| 21 | A | Right.                                                        |
| 22 | Q | Do you recall him saying anything else?                       |
| 23 | A | I believe Mr. Holmes said that if it's a good idea,           |
| 24 |   | substantiate the reason for it.  And he couldn't,             |
| 25 |   | and he ended our portion of the meeting.                      |

81

| | | |
|---|---|---|
| 1 | Q | Anyone else on the board say anything to contribute |
| 2 | | to the conversation? |
| 3 | A | They just agreed with Mr. Romano. |
| 4 | Q | Anyone say why? |
| 5 | A | No. |
| 6 | Q | How long did this -- was this agenda item discussed? |
| 7 | A | Every two weeks for -- |
| 8 | Q | No, I mean during this first meeting. |
| 9 | A | I would say probably 15 or 20 minutes. |
| 10 | Q | Did you say anything during the meeting? |
| 11 | A | No. |
| 12 | | (Deposition Exhibit No. 8 marked.) |
| 13 | Q | I'm going to hand you what we've marked as Exhibit |
| 14 | | No. 8, which I understand is a letter directed to |
| 15 | | you from the board of health.  You see that? |
| 16 | A | Yes. |
| 17 | Q | Do you recognize the letter? |
| 18 | A | Yes. |
| 19 | Q | Now, this letter indicates as the board of health |
| 20 | | told you at our meeting on August 12, 2003, before |
| 21 | | approving septic design plans you'll have to have a |
| 22 | | 21-E test study done.  Do you see where I'm reading? |
| 23 | A | Yes. |
| 24 | Q | Is it your understanding, is this letter referring |
| 25 | | back to the first meeting that you just told me |

| | | |
|---|---|---|
| 1 | Q | And is his occupation a videographer? |
| 2 | A | No. |
| 3 | Q | What does he do? |
| 4 | A | He has a carpet cleaning business. |
| 5 | Q | Where is that? |
| 6 | A | Out of his house. |
| 7 | Q | Do you know the name of it? |
| 8 | A | Moonlight Carpet Cleaning. |
| 9 | Q | Okay. So you were summarizing for me as best you |
| 10 | | could recall the approximately 12 meetings that you |
| 11 | | indicated that you went to. Is there anything else |
| 12 | | that you can remember that you haven't told me about |
| 13 | | these meetings? |
| 14 | A | No. Pretty much it's just that the criteria changed |
| 15 | | every time I went to a meeting as far as what |
| 16 | | actually had to be done. If you look at this |
| 17 | | document No. 1 here with the assessor's map -- |
| 18 | Q | Actually, let me go back to that. Is that the |
| 19 | | septic permit application? |
| 20 | A | Yes. |
| 21 | | MR. SANKEY: That's why I couldn't find it |
| 22 | | because we folded it under the assessor's map. I |
| 23 | | knew I had seen one. |
| 24 | Q | All right. So referring back to Exhibit No. 1, is |
| 25 | | that your signature? |

89

```
1    A    No.

2    Q    Do you know --

3    A    It almost looks like it might be Alfred.

4         MR. COREY:  Gouveia, Jr.

5    A    Yeah.

6    Q    Do you recall when he applied for the septic permit?

7    A    No, I don't.

8    Q    I don't see a date on it.  He didn't fill in a date.

9         MR. COREY:  Go off the record.

10        (Discussion off the record.)

11   Q    While we were off the record we looked at the

12        document.  Do you believe that this septic permit

13        was submitted after 6/6/03 which is the date of

14        the --

15        MR. COREY:  If you know.

16   Q    We came up with a rational why we think it was after

17        that.  Do you agree with that?

18   A    Yes.

19   Q    Okay.  And that was because the plan date was

20        6/6/03?

21   A    Yes.

22   Q    So it would be fair to say you didn't start having

23        meetings with the board of health until after the

24        application?  Did you have meetings with the board

25        of health prior to submitting the application?
```

1    A    Yes.

2    Q    How much time did you spend looking at documents

3         before you gave up?

4    A    About an hour.

5    Q    Did you find any information that you thought was

6         relevant to what was -- to the dispute concerning

7         your property?

8    A    I found what DEP made a map of where the

9         contamination was and an approximation of where the

10        closest corner of my property laid to the

11        approximated contaminated site that was cleaned up,

12        and it's close to a quarter of a mile.

13   Q    So based upon what you reviewed, make sure I

14        understand, the closest contamination that you

15        observed when you were at DEP was a quarter of a

16        mile away from your property line?

17   A    The very closest corner of my property line to the

18        contaminated site and again down through wetlands

19        and up a hill on the other side.

20   Q    Do you have any understanding of whether the

21        contamination that they were concerned about was in

22        the water or in the soil?

23   A    It was in the soil.

24   Q    Did you understand that they had concerns about

25        potential contamination on the Haul or the Old Haul

1      tested because there was no substantiation to do

2      testing on the rest of the site, that the only place

3      that the stuff could ever migrate would be along the

4      edge of the Haul Road and my property line.

5   Q  My question is, Mr. Dreyfus, is who at DEP said this

6      is where the test site should be?  Was that Julie

7      Hutchinson?

8   A  Julie discussed it with her boss, which is Millie

9      Garcia, and was in correspondence with Jim Romano.

10     And the three of them got together and decided that

11     the only place that it could migrate from would be

12     off of the Haul Road.  And being that they never

13     tested the Haul Road, they thought that they ought

14     to come out there and test it to make sure that it

15     was clean.

16  Q  So DEP agreed that there should be testing done

17     along the Haul Road on your property?

18  A  They didn't feel the need for it.  They were just

19     tired of the correspondence between Romano and them

20     and the different places that he kept changing his

21     mind.  First it's this end of the property, that end

22     of the property.  He was just running around

23     different spots.

24  Q  Anything else that you can recall about that

25     meeting?

1  A  That was pretty much the whole meeting.

2  Q  Did you agree to have the testing done?

3  A  I told them I had no problem with them coming onto

4     my property to test my side, and I actually spent

5     the morning out there with them while they were

6     doing it.

7  Q  So your understanding was DEP was going to do the

8     testing and pay for it?

9  A  Correct.

10  Q  You didn't pay for any testing?

11  A  No, I didn't.

12  Q  At any point during the time that we've already

13     talked about, did you ever agree at a meeting, tell

14     anyone on the board of health that you would do the

15     testing?

16  A  At one meeting I did agree that I would do testing

17     until I got a guesstimation of what it would cost to

18     do a 21-E test on a seven and a half, 7.18-acre

19     parcel of property.

20  Q  And how much was that?

21  A  Between $50- and $60,000.

22  Q  Who gave you that estimate?

23  A  I believe it was an LSP.  I don't remember which one

24     I called, but I've got a few of them that I called.

25     I had other people come by there that did work at

1    sites as far as some type of testing and everything,

2    and they gave me ballparks.  I never got anything in

3    actual writing.  But just the figure itself, it

4    wasn't going to happen.

5  Q    Did you ever agree to do anything less than a full

6    21-E, just drilling on the site to test soil?

7  A    That's where Mr. Romano jumped ship and he says that

8    I want you to do five test holes out here.  And I

9    got a guesstimation again at about $10,000 to do

10   that.  And at that point I still wasn't -- I was all

11   done with him.

12 Q    At some point in September, did you make a proposal

13   to address their concerns by digging out and taking

14   out soil samples under some agent of the board of

15   health and then the samples would be tested by some

16   environmental engineer as to whether the samples

17   contained contaminants?  Do you ever remember

18   anything like that that I'm referring to?

19 A    We had discussed it.  I don't believe I ever fully

20   agreed on it.  I agreed to look into it.

21           (Deposition Exhibit No. 11 marked.)

22 Q    I'm going to hand you a letter that we've marked

23   Exhibit No. 11, which I understand to be a letter

24   from your then attorney to the town's attorney David

25   Gay dated September 25, 2003, correct?  Have you

1        ever seen that before?

2    A    Yes.

3    Q    Now, again, I'm not -- I just want to caution you

4        I'm not asking you to disclose anything that you

5        talked about with your attorney.  But as I

6        understand this letter, it seems to be a proposal to

7        do what I just discussed; that you would dig out the

8        soil samples and that the samples would then be

9        tested by an environmental engineer.

10   A    Mm-hmm.

11   Q    Yes?  You said mm-hmm.

12   A    Yes.

13   Q    Was that a proposal that you had made?

14   A    Yes.

15   Q    And it was something that you were willing to do at

16        that point?

17   A    Yes.

18   Q    And did you receive a response to that proposal?

19   A    To the best of my recollection, the response to that

20        proposal was we decided not to do the test holes

21        anymore.  We decided because of Bogs Landing being

22        next door that we ought to do the boundary line.

23   Q    Do you recall the board indicating to you that they

24        would not allow you to do the testing yourself, but

25        they would accept soil tests if they were done by a

1       licensed site professional, LSP?

2  A   I recall that, yes.

3  Q   I'm going to hand you -- we'll mark that in a

4       second -- but a letter from the board of health to

5       whom it may concern on October 6, 2003.  Have you

6       seen that before?

7  A   Yes.

8  Q   And did you understand at that point that they would

9       accept soil tests from the rear lot if they were

10      done by a licensed site professional?

11  A   Yes.

12  Q   And they wanted six samples?

13  A   Right, yes.

14  Q   And these would be done at your expense?

15  A   Yes.

16  Q   Now, Paragraph 5 says the places to be tested have

17      already been supplied to you on a site plan marked

18      by the board at a meeting.  Does that refer back to

19      Exhibit No. 1?

20  A   Yes, it does.

21  Q   Now, Paragraph 7 is referring to in view of the

22      alleged threats made by Mr. Dreyfus against town

23      officials, we prefer that Mr. Dreyfus not be

24      present.  Do you know what they were referring to?

25  A   Yes.

1    Q    What was that, sir?

2    A    The letter from Mr. O'Boy to the board of health.

3    Q    And what was the threat?

4    A    Anything that Mr. O'Boy wrote to the town I believe.

5    Q    Is there anything specific that you said that you

6         were going to do or that you said that you

7         understood to be a threat?

8    A    Not out of my mouth.  I never raised my voice to any

9         of the people on the board of health or at any of

10        the meetings or made threats or accusations to any

11        one of them.

12                    (Deposition Exhibit No. 12 marked.)

13   Q    I'm just tying to make sure I understand the

14        sequence.  This was an offer that they said they

15        would -- all that they were looking for was a

16        testing of six samples, correct?  Was this before

17        you had the meeting with the DEP?

18   A    Yes.

19   Q    And did you respond to this proposal?

20   A    I don't believe so.

21   Q    Was there a reason you didn't want to do this, this

22        meaning what's referred to in Exhibit No. 12?

23   A    Because I was going -- because they were going to

24        have me hire an LSP to come out and do it, which was

25        the beginnings of the 21-E test; and, again, I don't

1   know why I'm doing a 21-E test on a clean piece of

2   property.

3   Q   Did you have an understanding that they were

4   requiring a full 21-E test or something less?

5   A   Until that letter came out there, it was never

6   outlined what I was supposed to do.

7       MR. COREY:  If I may interrupt.  Can we go off

8   the record?

9           (Discussion off the record.)

10          (Deposition Exhibit No. 13 marked.)

11  Q   Exhibit No. 13 I'm handing you.  Do you recognize

12  that, sir?

13  A   Yes.

14  Q   The letter from the conservation commission to you

15  on October 13?

16  A   Yes.

17  Q   What was the reason for this letter, if you know?

18  A   I believe this was a rumor that was going around

19  that the possibly Mr. Flint that lived down the road

20  there might have fraudulently done some testing on

21  the site because what he came up with was nothing

22  that would ever have been found on a site like that.

23  Q   Who told you that rumor?  Where did you hear that

24  rumor?

25  A   The person I talked to about that was Brandt

1       Hayworth who was another engineer around town; that

2       Mr. Flint had dug some samples and sent them in

3       under his name, and he didn't want to know anything

4       about it.

5    Q   Did you ever talk to Mr. Flint about the rumors that

6       he had done some testing?

7    A   He didn't want to talk about it either.

8    Q   Did you ask him?

9    A   Yeah.

10   Q   When did you ask him?

11   A   I think it could have been sometime around the date

12      on the letter. Once I received the letter, I might

13      have talked to him shortly after that.

14   Q   Did you initiate the conversation with him?

15   A   No. I think actually he might have -- I might have

16      mentioned it around to a couple of people. And I

17      think he came to me and said that, you know, he

18      didn't know what this was all about.

19   Q   Well, did he tell you whether or not he did any

20      testing on the property?

21   A   He wouldn't. He said the engineer did it. And then

22      I approached the engineer, and he said he didn't

23      have anything to do with it and didn't want to talk

24      about it anymore.

25   Q   Was it your understanding that the conservation

```
1        commission for the Town of Berkley did receive some

2        report indicating contaminants on that property?

3    A   Yes.

4    Q   And that property meaning the property that you

5        purchased?

6    A   Yes.

7    Q   Did you ever see the report?

8    A   I believe I did see something from the conservation

9        commission, but it was deemed not to be anything to

10       do with the tannery waste or anything that would

11       have been found on a piece of farm property, and

12       that's why it was sent over to this Mr. Jones.  And

13       the conservation commission talked with Mr. Jones

14       about it.  And he said the only way that what was

15       found on the property could have been found on the

16       property is if there used to be a gas station out

17       there.

18            So they kind of null and voided the whole thing

19       right there because the engineer -- Mr. Flint said

20       that the engineer did the sampling and the engineer

21       said Mr. Flint did the sampling, so now it's --

22   Q   But as far as you knew, someone had submitted

23       samples to be tested?

24   A   Well, they couldn't prove where they came from.

25   Q   I understand that.  I know we don't know who did it.
```

1    A    Right.  This is the rumor thing again.  Nobody was

2         there to witness the test.  Nobody was there to

3         witness where the stuff came from even if it ever

4         came off of that property.  And then the DEP more or

5         less backed that up by saying that it wouldn't be

6         anything that would be found there.

7    Q    Sir, what I'm asking is, is it your understanding

8         that someone, and I know you don't know who it is,

9         submitted testing, excuse me, submitted samples that

10        supposedly were taken from your property for

11        testing?

12   A    Yes.

13   Q    Who's Valerie Murray?

14   A    She's a person that lives on the northeast side of

15        this Bogs Landing site there who has been a thorn in

16        DEP's side forever.  She has basically started

17        research on people that have ended up with cancer

18        that live northeast of that piece of property and

19        basically claimed that Bogs Landing was the reason

20        for it because they all live opposite me on the

21        other side of where the ground water all flows and

22        that type of thing.

23   Q    But the property that they are referencing here that

24        the testing supposedly came from was your property

25        at 46 Rear North Main Street?

1    A    That's correct.

2    Q    And the only reason that you could surmise that

3         Mr. Flint would have even been involved in this was

4         at one point you understood that he had some

5         interest in that property?

6              MR. COREY:  Objection as to form.

7    A    Correct.

8    Q    And did you understand that at some point that

9         Mr. Flint and Valerie Murray had expressed concerns

10        about contamination on your property?

11   A    I didn't know it was to that extent, no.

12   Q    You didn't know it then or you don't know it now?

13   A    Well, a lot of this pertains to Bogs Landing.

14   Q    Do you recall anything else about conversations with

15        Mr. Flint about this issue, about the report on your

16        property?

17   A    He didn't want to discuss it.

18   Q    Did you ever talk to Valerie Murray about it?

19   A    No, as a matter of fact I never did.

20   Q    Do you know her?

21   A    Yes.

22   Q    During October of 2003 before the building permit

23        had been issued, did you actually begin construction

24        of the cabin?

25   A    Before I had a building permit?

1    with a septic -- they hadn't approved your septic,

2    is that correct?

3  A  They had the plan.  They just wouldn't act on it.

4  Q  And by November of 2003 you had not submitted the

5    results of the soil sample testing, correct?

6  A  Correct.

7  Q  And had you been told that they would not act on

8    your application until the soil sample test had been

9    completed?

10  A  Yes.

11  Q  So you knew that they weren't going to do anything

12    until you submitted the tests?

13  A  Well, that was the reason why I obtained counsel, to

14    find out if they could legally hold hostages on

15    certain things for other things.

16  Q  Right.  But whether it was legal or not, you had

17    been told by the board that they were not going to

18    act on your application until you submitted the soil

19    tests, the results of the soil tests, correct?

20  A  Right.

21  Q  And it was your decision that you didn't -- that you

22    weren't going to submit -- that you weren't going to

23    have the testing done?

24  A  Yes.

25              (Deposition Exhibit No. 15 marked.)

1    Q    I'm going to hand you Exhibit No. 15 which is a

2         document I'm sure you've seen before, correct?  And

3         I will apologize.  I think I stapled them out of

4         order.

5    A    Yes.

6    Q    You've seen this before?

7    A    Yes.

8    Q    And this is, as I understand it, a letter from DEP

9         to the Town of Berkley board of selectmen about

10        testing done by DEP, correct?

11   A    Yes.

12   Q    As I read this it indicates that DEP did some

13        testing on November 24 of 2003?

14   A    Yes.

15   Q    Were you there?

16   A    Yes, I was.

17   Q    And what happened on that day?

18   A    They tested approximately 15 different samples on my

19        property, on the boundary line and 15 different

20        samples on the Haul Road.

21   Q    And did you understand at that point that the

22        contaminant that they were looking for was chromium?

23   A    Yes.

24   Q    And you understood that chromium had been found on

25        the Bogs Landing site?

1   A   This was worked out between the two people at DEP

2       and James Romano.

3   Q   Well, do you have any reason to believe that Romano

4       said he wanted 30 locations?

5   A   He never states how many.  They just wanted the

6       whole boundary line checked from corner to corner.

7   Q   So at the beginning of this testing on November 24,

8       2003, it was your understanding that Romano had

9       backed off from Exhibit No. 1 where you had five

10      sites scattered on your property, correct?

11          MR. COREY:  Objection as to form.

12  Q   Is that right; that he had changed his position?

13  A   Yes.

14  Q   And at this point all he was looking to have tested

15      was the boundary of your property?

16  A   Yes.

17  Q   And DEP obviously as we said checked 30 sites.  And

18      what was your understanding of their findings?

19  A   Clean.

20  Q   No contaminants?

21  A   Correct.

22  Q   Did you get a copy of this directly from DEP as --

23  A   Yes, I did.

24  Q   -- indicated on the letter?  And when you got this

25      report, what did you do, if anything?

1   A   I believe I went into the building department, spoke

2       to Mr. Lawrence the building inspector who knew all

3       along that this was kind of crazy.

4   Q   How do you know that?

5   A   Well --

6           MR. COREY:  Answer the question, please.

7   A   Because there was never any document to substantiate

8       the need for any of this.

9   Q   I mean did Lawrence ever tell you that this was

10      crazy?

11  A   Along with everybody else in the town hall, yes.

12  Q   Well, I mean when you use terms like everybody else

13      in the town hall, obviously I need to ask you I mean

14      who else told you that?

15  A   Sure.  George Mattoza, the other -- I don't know

16      everyone's name, people in the clerk's office,

17      people in the assessor's office, people in the

18      building department, people in the -- ex-selectman,

19      other people in the neighborhood.  I mean I could go

20      on and on.  I could, you know, come up with, you

21      know, a telephone of Berkley and cross out the names

22      that didn't tell me that something was real wrong

23      here.

24  Q   Of the people that you are talking about, did any of

25      them tell you that the reason for this was due to

1    some improper motive of any kind?  Let me make a

2    better question.  Did anyone tell you that the board

3    of health's requirement that you have the testing

4    done was done by some -- as a result of some

5    improper motive?

6  A  I still don't understand.

7  Q  You've told me that essentially everyone in the Town

8     of Berkley was telling you this is crazy; that the

9     testing doesn't have to be done.  The board of

10    health is crazy.  They shouldn't make you do this.

11    Is that a fair slang summary of what people told

12    you?

13  A  Yes, it is.

14  Q  Of the people that told you things like that, did

15    anyone tell you that they thought that the reason

16    that the board of health or any of its members were

17    requiring you to have the soil testing was being

18    done for some improper, illegal motive or intention?

19  A  To my understanding, there's never been a document

20    saying that there's any problem with that piece of

21    property.  And as this has all gone so far, we've

22    seen how one minute it's because it's farm property,

23    one minute it's because for this reason, one minute

24    it's for that reason, one minute it's over in this

25    location, one minute it's over in that location.

1      That's the crazy part of it.

2          If before I ever bought this piece of property I

3      walked in there and there was a folder that said

4      this property is in question, this property needs to

5      be looked at, this property has a problem with it, I

6      would have never bought it.

7          But to go through all of this wasn't the right

8      way to go about it at all.  And to get belittled and

9      told things at meetings and embarrassed in front of

10     other people at the meetings and talked to like I

11     was a complete idiot the way he did and then to have

12     it all resolved at the end by the DEP actually

13     coming out because the contamination was never on

14     that property, the questionable property was the

15     property next door which wasn't part of this

16     property and then finally realizing that if anything

17     migrated uphill from the Haul Road onto my property

18     it was their problem, not mine.

19  Q  What I'm trying to get to, you'd agree with me that

20     people can have an honest disagreement over facts,

21     correct?

22  A  Yes.

23  Q  And some people by nature are more conservative than

24     others in carrying out their responsibilities,

25     correct?

1    A    Yes.

2    Q    Some people are more careful, more stringent in what

3         they require?

4    A    Yes.

5    Q    And someone can honestly have an opinion that is

6         more conservative or more stringent than someone

7         else and not do something illegal, you'd agree with

8         that, correct?

9              MR. COREY:  Objection as to form.

10   Q    Do you understand what I'm saying?

11   A    Yes.

12   Q    Just because someone has a stricter application of

13        rules and regulations doesn't mean that it's

14        illegal, is that correct?

15             MR. COREY:  Objection.  Calls for legal

16        conclusion.

17             MR. LONG:  That's what the case is all about.

18   Q    You can answer.

19   A    Yes.

20   Q    My question to you is -- let me put it to you this

21        way, Mr. Romano was putting requirements, as you

22        understand it, on your property that you thought

23        were not justified, is that fair?

24   A    Definitely.

25   Q    Not substantiated by any documentation?

```
 1   A   Correct.

 2   Q   To use the words that you were told around town that

 3       it was crazy that you should have to do what he was

 4       telling you to do?

 5   A   Correct.

 6   Q   Okay.  What facts do you have that cause you to

 7       believe that his reason for doing that were

 8       something other than an honest disagreement?

 9   A   Do you want me to answer that?

10   Q   Yeah.  I wouldn't have asked it.

11   A   Well, shouldn't there have been a document for me to

12       legally walk in to find at the board of health if

13       there was an issue on a piece of property that was

14       for sale; that I should have been able to walk into

15       the board of health when I was doing research on it

16       when my attorney -- you know, I just don't know

17       where this came from.

18   Q   Well, what facts do you have that cause you to

19       believe that he had an improper or illegal motive in

20       putting the requirements on you that you've

21       discussed?

22   A   I'm looking back at the case history of the

23       property.  People ate all the vegetables and the

24       corn and other things that were grown on that piece

25       of property.  Wouldn't that have been a health
```

| | | |
|---|---|---|
| 1 | | issue? |
| 2 | Q | Okay.  Anything else that caused you to think that |
| 3 | | he has done something with an improper or illegal |
| 4 | | motive? |
| 5 | A | Because he keeps changing his mind. |
| 6 | Q | All right. |
| 7 | A | He's stabbing, looking for somewhere to stab me. |
| 8 | Q | Why in your opinion is he doing that? |
| 9 | A | I don't know.  Maybe because I had Alfred Gouveia |
| 10 | | doing site work on my property. |
| 11 | Q | Okay.  You're saying maybe.  Why do you believe it? |
| 12 | A | Because Alfred Gouveia had him in front of the |
| 13 | | ethics board, and he was looking for payback, rumor. |
| 14 | Q | Anything other than rumors to substantiate that? |
| 15 | A | Well, it happened. |
| 16 | Q | Anything else? |
| 17 | A | I can't really say for sure.  You know, I've got |
| 18 | | nothing -- I've got no documentation to say what I'm |
| 19 | | saying except for newspaper articles. |
| 20 | Q | All right.  The letter of December 9, 2003, is it |
| 21 | | your understanding eventually it went to the board |
| 22 | | of health? |
| 23 | A | Yes. |
| 24 | Q | Did you have any discussions with the board of |
| 25 | | health about the DEP letter? |

1        public from contaminants in soil or water?

2   A    Definitely.

3   Q    And I take it then you would also agree that if they

4        have a reasonable belief that there are contaminants

5        in the soil or water, that they have some obligation

6        to take some sort of action?

7   A    Yes.

8   Q    There's a letter we haven't marked, I'll share it

9        with you, from Attorney O'Boy to the board of

10       health.  You are listed as a cc.  Have you seen that

11       letter before?

12   A    Yes.

13   Q    The letter references first down towards the end of

14       the first paragraph that you've been the subject of

15       alleged harassment based on undue influence of the

16       board by a longtime Berkley resident who desired to

17       purchase the parcel on which my client, referring to

18       you, intends to build his home.  Do you see where

19       I'm reading?

20   A    Yes.

21   Q    Do you know who that's referring to?  Who is the

22       longtime Berkley resident who desired to purchase

23       the parcel?

24   A    Gene Flint.

25   Q    And this letter from Mr. O'Boy indicates that

# EXHIBIT "D"

1              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS

2

3     ————————————————————————

4     ALAN DREYFUS,           )
         Plaintiff       )

5                          )      Vol. II
     vs.                )      Civil Action

6                          )      No. 05-10876WGY
     TOWN OF BERKLEY, ET AL,  )

7         Defendants      )

8     ————————————————————————

9         Deposition of ALAN DREYFUS, a witness called on

10    behalf of the Defendants, pursuant to the provisions of

11    the Massachusetts Rules of Civil Procedure, before Nancy

12    Atherton, a Certified Shorthand Reporter and Notary Public

13    in and for the Commonwealth of Massachusetts, at Pierce,

14    Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA

15    02110-1257, commencing at 10:10 A.M., Thursday,

16    February 16, 2006.

17

18

19

20

21

22

23

24               NANCY J. ATHERTON, CSR
                    35 Laura Lane

25                Norton, MA 02766
                 (508)223-1125

1       the beginning of the whole project there Mr. Gouveia

2       dug the perc.

3  Q   Okay.  Did he do anything else?

4  A   And later on I hired him directly to do site work as

5       far as digging for the foundation, putting in the

6       driveway and various other construction related --

7  Q   Was there anything else that he did in relation to

8       the construction?

9  A   No.  It was basically just site work.

10  Q   Is there any other knowledge that Mr. Gouveia has

11       about your particular claim other than what you told

12       me on the first day of your deposition?

13  A   He has a poor relationship with Mr. Romano.  And,

14       you know, I believe that that's about the best

15       firsthand knowledge I can give you as far as that

16       goes without, you know, just saying what he said and

17       so on and so forth.

18  Q   And in terms of saying what he said, did you tell me

19       all of that on the first day of the deposition to

20       the best of your ability?

21  A   I believe so.

22  Q   Other than rumor and innuendo and some of the things

23       we talked about, are there any particular facts that

24       Mr. Gouveia related to you to suggest that

25       Mr. Romano unlawfully or negligently interfered with

```
 1        your ability to get the permit?

 2   A    I don't know.  I can't give you an honest answer on

 3        that.

 4   Q    So you are not aware of any facts?

 5   A    No.

 6   Q    And I believe we also talked about Jeff Rose.

 7   A    Yes.

 8   Q    Of Hadrose Well Company, is that correct?

 9   A    Yes.

10   Q    And Mr. Rose was involved in trying to obtain the

11        well permit?

12   A    Correct.

13   Q    Did Mr. Rose have any other involvement in the case

14        other than what you told me?

15   A    No.

16   Q    I just want to make sure that I understood.  I was a

17        little bit unclear.  The well permit, was that

18        allowed by the board in July of 2003?

19   A    I would have to check with the actual date.  I

20        believe that's it.

21   Q    We're referring to Exhibit No. 5?

22   A    Yes.

23   Q    Okay.  So the well permit was allowed significantly

24        before the septic permit, correct?

25   A    Yes.  That's when they finally did allow it though.
```

1    interrogatory asked you to state all the actions

2    that you allege were committed by Mr. Romano that

3    you claim were either unlawful and negligent or

4    which otherwise violated your rights.  Did you

5    understand that question?

6  A    Yes.

7  Q    Would you just take a second to read over your

8    answer?  Mr. Dreyfus, as I understand your answer,

9    it appears that you are alleging that Mr. Romano did

10   three things:  No. 1, that he withheld approval of

11   your septic system plan without legal cause or

12   authority, correct?

13  A    Correct.

14  Q    Second, that he put burdensome requirements on the

15   approval of the septic plan not applied to other

16   Berkley residents, correct?

17  A    Correct.

18  Q    And third, he required testing to be done on the

19   property that was delineated under the rules and

20   regulations of the board of health or state law,

21   correct?

22  A    Correct.

23  Q    Are there any other acts that you allege Mr. Romano

24   committed that were either unlawful and negligent or

25   which otherwise violated your rights?

1   A   Well, he also held up my well driller's permit there

2       to put the well in.  But once he had the septic

3       plan, then he knew he could still hold me up and

4       allow me to be held up for a building permit because

5       it requires the water test results and the septic

6       plan approval there for a building permit in

7       Berkley.

8   Q   Well, how long did he hold up your well permit?

9   A   I would have had the well started shortly thereafter

10      the property was perked because realistically if I

11      can't -- if I don't have water on the property, then

12      I can't live there.

13  Q   And when was the property perked?

14  A   I believe that goes back into February of '03.

15  Q   We are referring to Exhibit No. 3.  And that would

16      have been before you even owned the property,

17      correct?

18  A   Correct.

19  Q   And then you received the permit to put in the

20      foundation in June, on June 4 of 2003 from the

21      building department, correct?

22  A   Correct.

23  Q   Was that held up at all?  Was the foundation permit,

24      was that held up at all by the board of health?

25  A   No, because the board of health was very upset that

```
 1            I got that.  As the application there I think says,

 2            that that's at my own risk.  So I'm putting in the

 3            foundation not knowing whether I'm going to be able

 4            to put a stick of wood on the foundation or have

 5            water or have the septic system approved.

 6       Q    So the granting of the foundation permit, and we'll

 7            refer to it as that, on June 4, 2003, that was done

 8            without any interference at all by the board of

 9            health, correct?

10       A    No.

11       Q    It's not correct?

12       A    No, no.  They were able to issue that without any

13            approval or any contact with the board of health at

14            all.

15       Q    So that's the earliest date that you could have

16            received the foundation permit was June 4 of 2003?

17       A    No.  I could have done it a lot sooner.

18       Q    And why didn't you?

19       A    I wasn't aware of the fact that I could start the

20            foundation without a building permit.

21       Q    And how did you find out that you could?

22       A    After numerous board of health meetings, I used to

23            go into the building department when I was down at

24            the board of health there and tell them it looks

25            like it's going to be two more weeks and I don't
```

1      know where it's going.  And I asked if there was

2      anything that I could do to continue construction

3      down there because I was going to lose my window of

4      opportunity to get the foundation people in there

5      after I've already put them off a couple of other

6      times when they were able to do it; that I didn't

7      want to lose them.  So he looked into it and

8      found out -- he being the building inspector looked

9      into it and found out that he could allow me to put

10     the foundation in there only.

11  Q  Okay.  Looking back briefly to Answer No. 7,

12     specifically the second sentence, He put burdensome

13     requirements on approval of the septic plan not

14     applied to other Berkley residents.  What other

15     Berkley residents are you alleging were not

16     subjected to the same requirements that you were?

17  A  Well, I believe that's kind of just a general

18     answer; that most people don't have to go through

19     what I went through to get a septic approval.  It

20     was all to code from Byron Holmes, the engineer that

21     designed it.  And he also does work for the board of

22     health as far as putting approvals together for a

23     lot of their projects, and there should have been no

24     problem with it at all.

25  Q  So you don't have any knowledge of any particular

```
 1              Berkley residents that were subjected to more

 2              burdensome requirements, is that true?

 3      A       That's correct.

 4      Q       I want to turn now to some questions about the

 5              damages that you've alleged.

 6                  MR. COREY:   Could I have one minute?

 7                      (Short break taken.)

 8      Q       I'm going to let you keep Exhibit No. 24 in front of

 9              you which is the answers to interrogatories.  That

10              will perhaps help us on the damages issue.  In your

11              answer to Paragraph -- to Interrogatory No. 12, as I

12              understand your answer to Paragraph -- to

13              Interrogatory No. 12, you've delineated a list of

14              categories in which you suffered damages, correct,

15              in which you allege that you suffered damages as a

16              result of the defendant's conduct?

17      A       Yes.

18      Q       And these include lost wages; carrying two

19              mortgages; losing money on the contractors'

20              deposits; building materials damaged by mold,

21              mildew, warpage; cost of every aspect increased

22              because of time and materials.  Did I read that

23              correctly?

24      A       Yes, you did.

25      Q       Are there any other areas of damages that you allege
```

54

```
 1        knew that the board was requiring only that test

 2        pits be taken to be sure that there's no

 3        contamination from the abutting properties?

 4   A    Well, I have a letter right in the file there that

 5        says I am required.

 6   Q    I understand that.  And that letter was before

 7        September 11, correct?

 8   A    I'm not sure of the date.

 9   Q    You are referring to Exhibit No. 8?

10   A    Yes.

11   Q    August 20 of 2003, correct?

12   A    Correct.

13   Q    And this is the letter you are saying indicates that

14        you needed to have a 21-E study done, correct?

15   A    Yes.

16   Q    But on September 11, isn't it correct that the

17        town's counsel told you that you didn't have to have

18        a 21-E study done, but that they wanted you to do

19        test pits?

20   A    Yes.

21   Q    So as of September 11, 2003, you knew that the only

22        test being required by the town were test pits?

23   A    Correct.

24        MR. SANKEY:  All right.  That's it for me.

25        Thanks.
```

# EXHIBIT "E"



# COMMONWEALTH OF MASSACHUSETTS
## EXECUTIVE OFFICE OF ENVIRONMENTAL AFFAIRS
## DEPARTMENT OF ENVIRONMENTAL PROTECTION
## SOUTHEAST REGIONAL OFFICE
**20 RIVERSIDE DRIVE, LAKEVILLE, MA 02347** 508-946-2700


COPY

**MITT ROMNEY**
Governor

**KERRY HEALEY**
Lieutenant Governor

**ELLEN ROY HERZFELDER**
Secretary

**ROBERT W. GOLLEDGE, Jr.**
Commissioner

EXHIBIT
No. 15
12/18/06
PENGAD 800-631-6989

December 9, 2003

Ms. Carol Mills, Chairperson
Town of Berkley
Board of Selectmen
Town Hall
1 North Main Street
Berkley, Massachusetts 02779

RE:    BERKLEY–BWSC
        58 North Main St
        46R North Main St
        RTN - 11247
        RTN# 4-18115

Dear Chairperson Mills:

On November 24, 2003 representatives from the Department of Environmental Protection (the "Department") Emergency Response Section performed soil testing along the northern boundary of the property at 46 R North Main Street. The parcel was recently purchased by Mr. Alan Dreyfus to build a single family residence. The Berkley Board of Health requested soil sampling be performed by Dreyfus to determine if contaminants consistent with those identified and removed from the Bog's Landing Site are present on the abutting property. Tannery waste was historically transported along a haul road off North Main St along the stonewall back into the area of the property owned by Mr. Douglas Cote referred to as the Bog's Landing Site.

In an effort to obtain the information required to determine if contamination was present along the stonewall bordering the Dreyfus property to the north, the Department conducted field sampling using a handheld NITON XRF analyzer model XL 700. The NITON XRF instrument is owned and registered to the Department. X-Ray Fluorescence analysis was used to delineate the extent of the tannery waste dumped on the Bog's Landing Site. The contaminant of concern used in both sampling events was Chromium. Chromium was present across the Bog's Landing Site in concentrations above other contaminants present.

The historic haul road used to transport the tannery waste back into the area known as the Bog's Landing Site comes off of North Main Street between the Cote property and the Dreyfus property. During the EPA and DEP tannery waste removal project a portion of the haul road off of North Main Street was not sampled because Chromium had not been detected along the haul road proximal to the site. To fill in this data gap thirty (30) locations along the haul road and on both sides of the stonewall were analyzed by DEP on November 24, 2003.

Prior to conducting this testing, surface organic material including leaves, sticks and topsoil were brushed away by hand in the sampling locations. As you can see in the attached data table, Chromium was not detected in any of the locations tested.

This information is available in alternate format. Call April McCabe, ADA Coordinator at 1-617-556-1171. TDD Service - 1-800-298-2207.

DEP on the World Wide Web: http://www.mass.gov/dep
♻ Printed on Recycled Paper

Berkley – XRF Sampling
November 24, 2003
DEP: Julie Hutcheson, Michael Whiteside

**DATA TABLE**

| Sample No. | XRF No. | Results |
|---|---|---|
| 1 | 314 | ND |
| 2 | 315 | ND |
| 3* | 316 | ND |
| 4* | 317 | ND |
| 5 | 318 | ND |
| 6* | 319 | ND |
| 7 | 320 | Incomplete Reading |
| 7 | 321 | Incomplete Reading |
| 8* | 322 | ND |
| 9 | 323 | ND |
| 10 | 324 | ND |
| 11 | 325 | ND |
| 12 | 326 | ND |
| 13 | 327 | ND |
| 14 | 328 | ND |
| 15 | 329 | ND |
| 16 | 330 | ND |
| 17 | 331 | ND |
| 18 | 332 | ND |
| 19 | 333 | ND |
| 20 | 334 | Incomplete Reading |
| 20 | 335 | ND |
| 21* | 336 | ND |
| 22* | 337 | ND |
| 23* | 338 | ND |
| 24* | 339 | ND |
| 25* | 340 | ND |
| 26* | 341 | ND |
| 27* | 342 | ND |
| 28* | 343 | ND |
| 29* | 344 | ND |
| 30* | 345 | ND |

NOTES:
* - Samples collected on Dreyfus property
ND – non detect
Incomplete Reading – indicates that the XRF encountered organic material that interfered with the reading. This could be caused by a root mass or decaying organic matter.

The Department is confident that this information should address the Board of Health's concern that testing of soil for possible tannery waste constituents be conducted on the Dreyfus property. If you have questions regarding this correspondence please contact Julie J. Hutcheson at the letterhead address above or 508-946-2852.

Very truly yours,

Richard F. Packard, Chief
Emergency Response/Release
Notification Section

P/JH/re

Nors/dreyfus letter

cc:    Mr. Alan Dreyfus
       119 Union Street
       Mansfield, MA  02048

       Mr. Douglas Cote
       58 North Main Street
       Berkley, MA  02779

ec:    Board of Health
       ATTN:  Mr. James Romano, Chairman

       Conservation Commission
       ATTN:  James McIsaac, Chairman

# EXHIBIT "F"



# BUILDING DEPARTMENT
## TOWN OF BERKLEY
### 1 NORTH MAIN ST
### BERKLEY, MASSACHUSETTS 02779
### 508-824-9286

DATE 6-4-03

PERMIT# 03116

ADDRESS 46R N. Main St

THIS IS FOR A FOUNDATION AT "OWNER'S RISK" FOR FUTURE PERMITS TO BUILD UPON FOUNDATION.

SIGNATURE

# EXHIBIT "G"

No. _____

FEE _200_00_

# 3146 plan review

EXHIBIT
No. 1
2a 1/10/06

## COMMONWEALTH OF MASSACHUSETTS

*Board of Health,* Bentley _____, MA.

## APPLICATION FOR DISPOSAL SYSTEM CONSTRUCTION PERMIT

Application for a Permit to Construct (✓) Repair ( ) Upgrade ( ) Abandon ( ) - ❑ Complete System  ❑ Individual Components

| Location 46R North Main Street | Owner's Name Alan Dreyfus |
|---|---|
| Map/Parcel# 2 | Address 119 Union St.   Mansfield |
| Lot# 5-02 | Telephone# 508 - 339 - 9089 |
| Installer's Name BLG Enterprises | Designer's Name Holmes Engineering Inc |
| Address 73 N. Main St.   Bentley | Address 622 Bentley St.   Bentley |
| Telephone# 508 - 823 - 0423 | Telephone# 508 - 880 - 6535 |

Type of Building ___ Single Family Home ___      Lot Size 2.18 Ac. sq. ft

Dwelling - No. of Bedrooms ___ 3 ___      Garbage grinder ( )

Other - Type of Building _____ No. of persons ___ Showers ( ), Cafeteria ( )

Other Fixtures _____

Design Flow (min. required) _330_ gpd   Calculated design flow _330_   Design flow provided _330_ gpd

Plan: Date _6-6-03_   Number of sheets _2_   Revision Date _____

Title _Septic System Plan for Alan Dreyfus_

Description of Soil(s) _0"-12" Sandy Loam   12"-24" Loamy Sand   24"-80" Loamy SN_

Soil Evaluator Form No. _4-25-03_ Name of Soil Evaluator _G Berner_ Date of Evaluation _____

DESCRIPTION OF REPAIRS OR ALTERATIONS _____

_____

_____

_____

The undersigned agrees to install the above described Individual Sewage Disposal System in accordance with the provisions of TITLE 5 and further agrees to not to place the system in operation until a Certificate of Compliance has been issued by the Board of Health.

Signed X _____ Date _____

Inspections _____

_____

_____

No. _____      FEE _____

## COMMONWEALTH OF MASSACHUSETTS

*Board of Health,* _____, MA.

## CERTIFICATE OF COMPLIANCE

Description of Work:  ❑ Individual Component(s)  ❑ Complete System

The undersigned hereby certify that the Sewage Disposal System; Constructed ( ), Repaired ( ), Upgraded ( ), Abandoned ( )

by: _____

at _____

has been installed in accordance with the provisions of 310 CMR 15.00 (Title 5) and the approved design plans/as-built plans relating to application No. _____, dated _____. Approved Design Flow _____ (gpd)

Installer: _____

Designer: _____ Inspector: _____ Date: _____



Perc tests to be 100 feet from any wetland resource area and 200 feet from any perennial stream or river

| Holmes Engineering, Inc. *Civil Engineering and Consulting* 622 Berkley Street Berkley, MA 02779 Phone: 508-880-6535 | ASSESSORS PLAN A.P. 2, LOT 51-02 & 51-02.3 46 & 46R NORTH MAIN STREET BERKLEY, MASSACHUSETTS | DATE: JANUARY 21, 2003 SCALE: 1" = 500' |

# EXHIBIT "H"



# TOWN OF BERKLEY

## MASSACHUSETTS

———

## OFFICE OF
## BOARD OF HEALTH

**1 NORTH MAIN STREET**
**BERKLEY, MA 02779**

**TELEPHONE (508) 828-7828**
**FAX (508) 880-2055**

EXHIBIT
No. 8
2-1/10/66

August 20, 2003

Mr. Alan Dreyfus
119 Union Street
Mansfield, MA   02048

Dear Mr. Dreyfus:

As the Board of Health told you at our meeting on August 12, 2003, before approving
septic design plans, you need to have a 21E study done on the soil on your property at
46R North Main Street.  This property is located on or near the site known to have had
tannery waste dumped on it.

To ensure the health of future occupants of the site, we need proof that the area is not
contaminated.

Regards,
BERKLEY BOARD OF HEALTH


James Romano, Chairman


Anne Hathaway, Clerk


Steven Rapoza, Member

# EXHIBIT "I"

**GAY & GAY ATTORNEYS, P.C.**



73 Washington Street

P.O. Box 988

Taunton, Massachusetts 02780

David T. Gay
Thomas P. Gay
Katherine A. Field
Marguerite M. DeMejo

Peter B. Gay
Of Counsel

Tel. (508) 822-2071
Fax (508) 880-2602

September 11, 2003

Francis M. O'Boy, Esquire
Law Offices of Francis M. O'Boy
41 Harrison Street
Taunton, MA 02780

EXHIBIT
No. 10
2α-1/10/06
PENGAD 800-631-6989

**RE:**   *Property of Alan Dreyfus/Board of Health Town of Berkley*

Dear Attorney O'Boy:

Confirming our recent telephone conferences on the above matter, it is my understanding that the Board of Health will review your letter at its meeting to be held on Tuesday, September 9, 2003.

From speaking with the Chairman of the Board, James Romano, it is also my understanding that the Board has not requested a 21E study on your client's property but has requested that test pits be taken to make sure that there is no contamination from abutting properties. I understand, also from our discussions, that your client's position is that the water tests that have been done, have come back satisfactory and that, as a general rule, the water flow underground is from your client's property away toward the contaminated property and not in the other direction. I am certain that this matter can be resolved without litigation and will be in further contact with you after I have corresponded directly with the Board.

Very truly yours,

**GAY & GAY ATTORNEYS, P.C.**

David T. Gay, Esquire

DTG/src

cc:    Board of Health
       Attn: Mr. James Romano
cc:    Board of Selectmen
       Attn: Ms. Julie Taylor, Chairman

F:\Susan\DTG\Berkley\Brd of Hlth - Dreyfus 810.89\ltr to Atty O'Boy 9.10.03.wpd

# EXHIBIT "J"



**TOWN OF BERKLEY**

**MASSACHUSETTS**

———

**OFFICE OF**
**BOARD OF HEALTH**

1 NORTH MAIN STREET
BERKLEY, MA 02779

TELEPHONE (508) 828-7828
FAX (508) 880-2055



October 6, 2003

To Whom It May Concern:

On October 1, 2003, the Berkley Board of Health met in Executive Session to discuss the proposal of Alan Dreyfus regarding 46R North Main Street. Our Board rejected his proposal to do the testing himself.

1. We will accept soil tests from 46R North Main Street if they are done by a Licensed Site Professional (LSP).

2. We will require at least 6 (six) different samples.

3. These samples can be taken from the upper 24 inches of the soil e.q. from the surface to the depth of 24 inches.

4. The LSP, tests, and all associated expenses will be paid for by the property owner or his agent.

5. The places to be tested have already been supplied to A. Dreyfus on a site plan marked by the Board at a meeting.

6. A Board of Health member can be present.

7. In view of the alleged threats made by Mr. Dreyfus against Town Officials, we prefer that Mr. Dreyfus not be present.

8. The compounds to be tested for are:
   a. All metals, including chromium, hexavaliant (sp) chromium, lead, arsenic, mercury, and barium.
   b. Acetone
   c. Dioxin
   d. PCB's
   e. And any other compounds deemed appropriate by the LSP with regard to potential tannery waste.

# EXHIBIT "K"



# TOWN OF BERKLEY
## MASSACHUSETTS

---

### OFFICE OF
### BOARD OF HEALTH

1 NORTH MAIN STREET
BERKLEY, MA 02779

TELEPHONE (508) 828-7828
FAX (508) 880-2055



January 15, 2004

Mr. Alan Dreyfus
119 Union Street
Mansfield, MA  02048

Dear Mr. Dreyfus:

Our Board is in receipt of a letter from DEP dated December 9, 2003, regarding testing done on your property at 46R North Main Street. We feel that this testing, while accurate, appears to be very limited.

We asked you on August 12, 2003 to do approximately 7 (seven) soil tests on different area of the property. The tests conducted by DEP show so apparent contaminates on the areas tested.

We do, however, at this time recommend that for your protection and for the protection of future owners of this property that you conduct the other testing as requested.

However, we will, a this time, accept and review your septic plans and will not hold up your other permits.

Regards,
BERKLEY BOARD OF HEALTH

James Romano, Chairman

Anne Hathaway, Clerk

Steven Rapoza, Member

# EXHIBIT "L"

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALAN DREYFUS,<br>        Plaintiff, | )<br>)<br>)<br>)<br>) |
| v. | )<br>) |
| JAMES ROMANO, TOWN OF<br>BERKLEY and BOARD OF HEALTH,<br>      Defendants. | )<br>)<br>)<br>) |

DOCKET NO.: 05 10876 WGY

## PLAINITFF, ALAN DREYFUS'
## ANSWERS TO DEFENDANT'S INTERROGATORIES

1.  Please state your name; date of birth; residential address; occupation; name and address of your employer.

    *Alan S. Dreyfus, 46R North Main Street, Berkley, Massachusetts, auto technician, self employed.*

2.  Identify all persons whom you now or believe witnessed or participated in any aspect of the transaction(s) or occurrence(s) giving rise to your claims against the defendants, or whom you know or believe have discoverable information concerning your claims or the defendants' position or defenses.

    *Byron Holmes of Holmes Engineering, Kevin and Mary Hoar, Alfred Gouveia, and Jeff Rose of Hadrose Well.*

3.  As to each person identified in response to Interrogatory No. 3, provide a statement of the subject(s) about which that person has knowledge or that you believe he or she may have knowledge and a brief summary of that information.

    *Byron Holmes attended Board of Health meetings, Kevin and Mary Hoar were also at Board of Health meetings, Jeff Rose attempted to obtain well permit from Board of Health.*

4.  Please identify all communications between you and the defendants, or any of them, that relate to any aspect of the transaction(s) or occurrence(s) giving rise to your claims against the defendants, and, for each such communication, please state:

a.  the date of the communication;
b.  the identity of all person(s) involved in the communication;
c.  the substance of the communication; and
d.  if the communication was written, the location and custodian of said writing.

> *a.  April, 2003*
> *b.  Board of Health*
> *c.  Why well permit would not be granted, why septic would not be granted*
> *d.  Attorney's office*

5.  In reference to your claims in paragraphs 10-12 of your Complaint, please identify each and every "professional" that you had any communication concerning the construction of any structure on your property and, for each said communication with any such "professional," please state:

a.  the date of communication;
b.  the identity of all person(s) involved in the communication;
c.  the substance of the communication; and
d.  if the communication was written, the location and custodian of said communication.

> *5.  All communications were conducted with assistance of counsel.*

6.  In regard to the construction of a log home on your property, please provide a chronology of events by stating the date that each of the following events occurred:

a.  the date that you purchased the property;
b.  the date that you applied for each permit relating to construction of any structure on the property;
c.  the date of each meeting with the Board of Health that you attended relating to said permits;
d.  the date that the components of the log home were delivered to the property;
e.  the date the construction of a well on the property began;
f.  the date that construction of a septic system on the property began;
g.  the date that each permit relating to the property was granted; and
h.  the date that construction of the home was completed.

> *6.  I purchased the land on April 18, 2003.  I instantly applied to perc tests upon purchasing the property.  I am not sure of the exact dates.  I do not know the date of each meeting I attended.  The components of the log home*

*were delivered on or about July of 2003. Construction of the septic system begun sometime in 2004. The Building Permit was granted on December 3, 2003. The home is still under construction.*

7.    Please state with particularity each and every action committed by defendant, James Romano, that you claim was unlawful, negligent or which otherwise violated your rights in any manner.

   *7. James Romano under the color of law withheld approval of my septic system plan without legal cause or authority. He put burdensome requirements on approval of septic plan not applied to other Berkley residents. He required testing be done on the property not delineated under the rules and regulations of the Board of Health or State Law.*

8.    Please state with particularity each and every action committed by defendant Berkley Board of Health that you claim was unlawful, negligent or which otherwise violated your rights in any manner.

   *8. See my answer to interrogatory number 7.*

9.    Please state with particularity each and every action committed by defendant, Town of Berkley, that you claim was unlawful, negligent or which otherwise violated your rights in any manner.

   *9. They changed their mind about why they thought it needed to be tested (waited two weeks for each change); would never agree to put anything in writing; when I got someone to video or take notes we were thrown out of the meeting; didn't follow any regulation by Board of Health code; wouldn't put minutes of any meeting in writing after it was requested; embarrassed me at meetings.*

10.    In regard to your allegations in paragraph 56 of your Complaint, please state that specific provision of each and every federal and state constitution and/or statute that you allege was violated by the defendants, stating which defendant violated which provision.

   *10. Objection. The Complaint was drafted with the assistance of counsel and the allegation speaks for itself.*

11.    If you contend that the defendants did not have the right to withhold approval of the permits for well and septic systems on your property until they were satisfied that the property was not contaminated, pleas state the factual and legal bases (sic) for your contention.

   *11. The rules and regulations as adopted by the Berkley Board of Health do not require 21E environmental testing be done prior to or as a condition of*

*issuance of a sewage disposal permit. Massachusetts State Law requires that the Board of Health render a decision on a properly filed application within 45 days of receipt of the application or deny and notify the applicant in writing of reasons for denial. They failed to do so.*

12.     Please state how the actions of the defendants caused you to suffer damages.

*12. Lost wages, carrying two mortgages, lost money on contractors (deposits), building materials damaged by mold, mildew, warpage, cost of every aspect increased because of time and materials.*

13.     Please state, in dollars and cents, the damages you allege you have suffered as a result of the alleged conduct of the defendants, and:

     a.  describe in as much detail as possible the method (including any formulas or other mathematical techniques) used in arriving at said amount;

     b.  set forth in as much detail as possible all facts used and considered in arriving at said amount;

     c.  if any writing was relied upon in whole or in part to calculate your alleged damages, identify such writing;

     d.  if any oral communication was relied upon in whole or in part to calculate your alleged damages, identify each such oral communication; and

     e.  identify all persons, including experts and attorneys, who assisted you in arriving at said amount.

*13. I am unable to fully calculate said damages at this time but agree to supplement this answer upon review of this matter by expert.*

14.     For each expert witness you intend to call at trial in this matter, identify:

     a.  the expert's name, business address, and professional qualifications;

     b.  the subject matter on which the expert if expected to testify;

     c.  the substance of the facts and opinions to which each said expert is expected to testify; and

     d.  a summary of the grounds for each said expert's opinion(s).

*14. The Plaintiff has yet to retain an expert at this time but reserves the right to supplement this answer at a later date.*

15.     Please describe all actions taken by you to determine whether the subject property was contaminated, identifying each and every person or entity that was involved in any test or evaluation, stating what each person or entity did

and when they did it.

> *15. The request for testing by the Board of Health was an unlawful act not required by their own regulations and rules or the State Sanitary Code. Tests beyond percolation tests and submittal of a design were not required for the issuance of a building permit.*

16.    Please identify each and every person or entity whom provided you with any information concerning the condition of the property.

> *16. Julie Hutchinson and Millie Garcia of the Department of Environmental Protection; the Secretary of the Berkley Board of Health.*

17.    In regard to paragraph 37 of your Complaint, please describe all "research" that was conducted "to determine the suitability of the site for a home and to discover any evidence of contamination that may have been present on the site," and please state:

>     a.  the person or person(s) who conducted or participated in the research;
>     b.  all sources that were consulted or reviewed in the conduct of the research;
>     c.  all information that was obtained as a result of the research; and
>     d.  if any written material was obtained, the location and/or custodian of said written material.

> *17. I reviewed all files for my property held by the Town of Berkley; and contacted relevant State agencies. There were no files or folders regarding this land. The land was used to grow vegetables, corn, and flowers and was sold to the public with no issues from the Board of Health. Two house lots were sold along the road on the same piece of land and Board of Health did not require any testing of any kind and a house has been built.*

Signed under the pains and penalties of perjury this 30th day of November,

2005.

_____
Alan Dreyfus

AS TO OBJECTIONS:

_____
Brian R. Corey, Jr., Esquire

<u>CERTIFICATE OF SERVICE</u>

I, Brian R. Corey, Jr., counsel for the Plaintiff, hereby certify that I have served a copy of the foregoing document upon the Defendants by mailing same, first class mail, postage pre-paid, on this 1st day of December, 2005, to:

Jeffrey M. Sankey, Esquire
Pierce, Davis and Perritano, LLP
Ten Winthrop Square
Boston, Massachusetts 02110-1257

Brian R. Corey, Jr., Esquire